## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

SANJAY GUPTA,

                Plaintiff,                             Case No. 1:23-cv-00201-PLM-RSK

v.                                                  Hon. Paul L. Maloney

TERESA K. WOODRUFF, et al.,

                Defendants.

---

## DEFENDANTS' REPLY BRIEF IN SUPPORT OF OMNIBUS MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

### ORAL ARGUMENT REQUESTED

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................... ii

I.    THE BOARD HAS SOVEREIGN IMMUNITY; PLAINTIFF FAILS TO
      OVERCOME IMMUNITY ARGUMENTS FOR INDIVIDUAL DEFENDANTS
      IN THEIR OFFICIAL AND INDIVIDUAL CAPACITIES ............................................ 1

II.   PLAINTIFF FAILS TO OVERCOME LACK OF REDRESSABILITY AND
      STANDING ....................................................................................................... 2

      A.    Plaintiff Has Not Alleged Injury Traceable to Individual Defendants ................. 3

      B.    Plaintiff Sidesteps the Proper Redressability Analysis ........................................ 3

III.  PLAINTIFF'S CLARIFIED DUE PROCESS ARGUMENT FAILS ............................. 4

      A.    Plaintiff Was Not Deprived of a Property Interest ............................................... 4

      B.    Plaintiff Has Not Stated a Liberty Interest in His Reputation ............................. 6

IV.   PLAINTIFF'S MATERIALLY CHANGED EQUAL PROTECTION CLAIM
      FAILS ............................................................................................................... 7

V.    PLAINTIFF'S STATE LAW CLAIMS MUST BE DISMISSED ................................. 8

      A.    Tortious Interference With Contract .................................................................. 8

      B.    Aiding and Abetting Tortious Interference ........................................................ 9

      C.    Defamation ..................................................................................................... 11

CERTIFICATE OF COMPLIANCE ........................................................................... 16

# TABLE OF AUTHORITIES

**aPage(s)**

**Cases**

*16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*,
   727 F.3d 502 (6th Cir. 2013) ...................................................................................7

*Bates v. Green Farms Condo. Ass'n*,
   958 F.3d 470 (6th Cir. 2020) ...................................................................................9

*Boler v. Earley*,
   865 F.3d 391 (6th Cir. 2017) ...................................................................................2

*Brown v. City of Niota, Tennessee*,
   214 F.3d 718 (6th Cir. 2000) ...................................................................................6

*Chauhan v. Baker*,
   865 F.2d 1267 (6th Cir. 1988) .................................................................................6

*Chilingirian v. Boris*,
   882 F.2d 200 (6th Cir.1989) ....................................................................................6

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) .................................................................................................3

*D.C. v. Wesby*,
   138 S. Ct. 577 (2018) ...............................................................................................2

*Dameron v. Washington Mag., Inc.*,
   779 F.2d 736 (D.C. Cir. 1985) ...............................................................................11

*Dep't of Com. v. New York*,
   139 S. Ct. 2551 (2019) .............................................................................................3

*El Camino Resources, LTD v Huntington Nat. Bank*,
   722 F.3d 875 (W.D. Mich. 2010).......................................................................9, 10

*Engquist v. Oregon Dep't of Agr.*,
   553 U.S. 591 (2008)..................................................................................................7

*Feterle v. Chowdhury*,
   148 Fed. Appx. 524 (6th Cir. 2005).........................................................................6

*Fremont Reorganizing Corp. v. Duke*,
   811 F. Supp. 2d 1323 (E.D. Mich. 2011).............................................................9, 10

*Georgia R.R. & Banking Co. v. Redwine*,
  342 U.S. 299 (1952) ...................................................................................4

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974) .................................................................................11

*Grossman v. Smart*,
  807 F. Supp. 1404 (C.D. Ill. 1992) ..........................................................11

*Gunasekera v. Irwin*,
  551 F.3d 461 (6th Cir. 2009) .....................................................................4

*Heike v. Guevara*,
  654 F. Supp. 2d 658 (E.D. Mich. 2009) ...................................................11

*Horton v. 48th Dist. Ct.*,
  446 F. Supp. 2d 756 (E.D. Mich. 2006) .....................................................4

*Hutchinson v. Proxmire*,
  443 U.S. 111 (1979) .................................................................................11

*Indusource, Inc. v. Sandvik Tooling France S.A.S.*,
  2016 WL 6216003 (E.D. Mich. Oct. 25, 2016) ..........................................9

*Kaminski v. Coulter*,
  865 F.3d 339 (6th Cir. 2017) .....................................................................5

*Kentucky v. Graham*,
  473 U.S. 159 (1985) ...................................................................................2

*Kevorkian v. Am. Med. Ass'n*,
  602 N.W.2d 233 (Mich. Ct. App. 1999) ...................................................13

*Kreipke v. Wayne State Univ.*,
  807 F.3d 768 (6th Cir. 2015) ................................................................8, 11

*Locricchio v. Evening News Ass'n*,
  476 N.W.2d 112 (Mich. 1991) .................................................................13

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ................................................................................2, 3

*Maiberger v. City of Livonia*,
  724 F. Supp. 2d 759 (E.D. Mich. 2010) .....................................................8

*Nichols v. Moore*,
  396 F. Supp. 2d 783 (E.D. Mich. 2005), *aff'd,* 477 F.3d 396 (6th Cir. 2007) ........................14

*Patton Wallcoverings, Inc. v. Kseri*,
   2015 WL 3915916 (E.D. Mich. June 25, 2015)....................................................13

*Perry v. Sindermann*,
   408 U.S. 593 (1972)..........................................................................................4, 5

*Reed v. Goertz*,
   598 U.S. 230 (2023)..............................................................................................4

*Rieves v. Town of Smyrna, Tennessee*,
   67 F.4th 856 (6th Cir. 2023) .................................................................................3

*Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.*,
   475 F.3d 783 (6th Cir. 2007) ................................................................................8

*Sheets v. Mullins*,
   287 F.3d 581 (6th Cir. 2002) ................................................................................2

*Siddiqui v. Gen. Motors Co.*,
   2012 WL 335680 (Mich. Ct. App. Feb. 2, 2012)................................................13

*Singfield v. Akron Metro. Hous. Auth.*,
   389 F.3d 555 (6th Cir. 2004) ................................................................................5

*Steverson v. Walmart*,
   2019 WL 3822179 (M.D. Tenn. Aug. 15, 2019) ..................................................1

*TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cnty., Ohio*,
   430 F.3d 783 (6th Cir. 2005) ................................................................................7

*Warren v. City of Athens*,
   411 F.3d 697 (6th Cir. 2005) ................................................................................7

**Court Rules**

Fed. R. Civ. P. 10(c) ...................................................................................................1

L. Civ. R 7.2(b)(i) .....................................................................................................16

**Other Authorities**

US Const. Amend XI ...............................................................................................2, 4

Plaintiff's opposition brief—rife with concessions, admissions, contradictions, divergence from his complaint, and misapplication of legal principles—only further supports dismissal of this lawsuit.  He has abandoned his original theory of the case that Woodruff sought to remove him from contention to be the next MSU President—as that allegation was as illogical as it was unsupported, particularly considering Woodruff announced she has *no intention* to be President.[1] Plaintiff's opposition brief also fails to cure his obvious pleading deficiencies, all while ignoring that he resigned (PageID.1032); sidestepping Defendants' redressability arguments; and misunderstanding how sovereign or qualified immunity works in this case to bar each of his claims. Instead, in an attempt to salvage his ill-pled claims, Plaintiff simply disputes MSU's determination that he violated the Mandatory Reporting Protocol, while curiously relying upon the Quinn Emmanuel Report ("QE Report") that *also found he violated the Protocol.*  (PageID.672).

Plaintiff attempts to misdirect from the dispositive legal issues that doom his claims. Although his cherry-picking of the QE Report is obvious, none of it saves his complaint from dismissal.[2]

## I.   THE BOARD HAS SOVEREIGN IMMUNITY; PLAINTIFF FAILS TO OVERCOME IMMUNITY ARGUMENTS FOR INDIVIDUAL DEFENDANTS IN THEIR OFFICIAL AND INDIVIDUAL CAPACITIES

Plaintiff does not dispute that the Board, as a public body corporate, is entitled to sovereign immunity here, requiring dismissal of Counts I and II against the Board.

---

[1] The Court may take judicial notice of publicly available information, https://msu.edu/issues-statements/2023-08-20-statement-on-interim-president-decision-to-not-seek-presidency.

[2] Plaintiff's apparent argument that the entirety of the QE Report should be considered *his* substantive allegations must be rejected.  *Steverson v. Walmart*, 2019 WL 3822179, at *2–3 (M.D. Tenn. Aug. 15, 2019) (lengthy e-mail describing allegations and background facts "not a 'written instrument' under [Rule 10(c)], because it does not evidence legal rights or duties or give formal expression to any legal act or agreement, such as a statute, contract, will, lease, promissory note, share certificate, or other formal agreement") (collecting Sixth Circuit cases).

Next, concerning what claims can be pursued in light of immunity, Plaintiff misquotes *Kentucky v. Graham*, 473 U.S. 159 (1985) (PageID.1349), claiming it held qualified immunity is not a defense to official capacity claims (which Defendants never argued). It correctly held the Eleventh Amendment bar "remains in effect when State officials are sued for damages in their official capacity." *Id.* at 169. Thus, Plaintiff is limited to only "claims for prospective [injunctive] relief against" Defendants in their official capacities, which fail here for lack of standing or redressability as addressed below. *Boler v. Earley*, 865 F.3d 391, 412 (6th Cir. 2017).

Further, "[t]he ultimate burden of proof is on the plaintiff to show that [each] defendant is not entitled to qualified immunity" in their individual capacities. *Sheets v. Mullins*, 287 F.3d 581, 586 (6th Cir. 2002). Plaintiff's conclusory assertions that qualified immunity is inapplicable cannot overcome Defendants' entitlement to immunity; Plaintiff must allege violations of clearly established constitutional rights with a "high degree of specificity," focusing on a showing that the individual has not "acted reasonably." *D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018). Plaintiff's complaint sorely lacks that requisite specificity.

## II.  PLAINTIFF FAILS TO OVERCOME LACK OF REDRESSABILITY AND STANDING

Plaintiff argues incorrectly that he has standing for his claims for injunctive relief because *if* he is awarded the relief he seeks, his alleged harms *may* be redressed. (PageID.1335). That is not how standing analysis—specifically redressability analysis—applies in this case: while the relief Plaintiff seeks, if awarded, might theoretically resolve his alleged harm, none of the individual Defendants can effectuate the redress for the claims he has chosen to pursue. The distinct elements of standing—(i) an injury; (ii) traceable; and (iii) redressability—cannot be amalgamized. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

### A.       *Plaintiff Has Not Alleged Injury Traceable to Individual Defendants*

Plaintiff clarifies his alleged injury stems from "adverse employment actions," including his resignation as Dean, return to faculty without an endowed professorship, and liberty interest in his reputation.  (PageID.1334).  Plaintiff still does not trace any one of them to any one of the individual Trustee Defendants.[3]   Rather, Plaintiff appears to assert that the Trustees failed to take some form of ill-defined "action" *after* his alleged injuries.   (PageID.1335).  Plaintiff, thus, has not identified any affirmative action by the Trustees individually that would give rise to a cause of action.  Post-injury inaction cannot logically cause the alleged injury as a "predictable effect," which requires action that is traceable to an "actual or imminent" injury.  *Lujan*, 504 U.S. at 560.[4] Plaintiff cannot escape that his case centers on decision-making that does not link to any Trustee.

### B.       *Plaintiff Sidesteps the Proper Redressability Analysis*

This same disconnect between individual versus group action undermines Plaintiffs' redressability argument.   Knowing this, Plaintiff attempts to circumvent the Board's sovereign immunity by advancing a novel theory naming each Trustee *individually* and demanding that they be ordered *collectively* to reinstate his Dean title.   If the Court were to capitulate, it would be

---

[3] Plaintiff's voluntarily resignation is not "fairly traceable" to any Defendant because he—by choosing to resign from Dean, *even if* in the face of potential removal as Dean—"inflict[ed] harm on [him]self[f] based on [his] fears of hypothetical future harm."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).  Further, if Plaintiff asserts that "the adverse employment actions" are traceable to Woodruff, he now contends she acted alone ((PageID.1327), abandoning any claim against Stanley, despite Plaintiff's contradictory allegations that Woodruff consulted with Stanley several times and that he supported her actions (PageID.610; 649)).  And Plaintiff does not clarify how Quinn is empowered to grant him a name-clearing hearing, even if he were entitled to one (PageID.1343).  Aside from conclusory allegations that this Court must ignore, he otherwise does not trace any alleged injury to any Defendant.

[4] Plaintiff's reliance on *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019) and *Rieves v. Town of Smyrna, Tennessee*, 67 F.4th 856, 862 (6th Cir. 2023) to allege his injuries are the "predictable effects" of the Trustees' nonactions is misguided.   These cases reviewed governmental actions prior to, not after, another defendant's actions and the alleged injury. (PageID.1334-35).

creating a new exception to sovereign immunity, dismantling the intent of the Eleventh Amendment's protections the Board has invoked.[5]  See *Georgia R.R. & Banking Co. v. Redwine*, 342 U.S. 299, 304 (1952) ("If this action is, in effect, an unconsented suit against the State, the action is barred.").  Otherwise, Plaintiff does not argue that any individual Defendant has the authority to provide him with the injunctive relief he seeks.

## III.   PLAINTIFF'S CLARIFIED DUE PROCESS ARGUMENT FAILS

### A.   *Plaintiff Was Not Deprived of a Property Interest*

Plaintiff clarifies an alleged protected property interest in: (1) his former Dean title; and (2) in an endowed professor title after his resignation from Dean.

Plaintiff concedes that his Offer Letter states his Dean title was at-will and could be discontinued at any time (PageID.770-71), eliminating any cognizable property interest.[6]  Plaintiff nonetheless argues in conclusory fashion by citing to the QE Report there was a University "custom" of complying with specific dismissal and revocation policies.  (PageID.1342).  He fails to allege facts to support such custom existed at all, let alone where, as here, the role is at-will and Plaintiff made the decision to resign.  Indeed, with respect to his Dean title, Plaintiff relies on an

---

[5] Plaintiff's citation to *Reed v. Goertz*, 598 U.S. 230, 234 (2023) is wrong.  That case held the defendant who *caused the injury* could likely *redress the injury* upon a declaratory court order. (PageID.1335).  Plaintiff has not explained how the Trustees caused any of his alleged harms, or how an individual Trustee can redress them.  Plaintiff, as the master of his complaint, bears the burden to state proper legal claims against proper parties to pursue the relief he seeks.

[6] Plaintiff points to multiple cases to argue that his Dean title is a protected property interest, but none involved a resignation or the existence of an at-will agreement.  *Gunasekera v. Irwin*, 551 F.3d 461 (6th Cir. 2009) (interest derived from a custom where all professors received same status upon meeting four criteria); *Perry v. Sindermann*, 408 U.S. 593 (1972) (Faculty Guide promised continued employment with satisfactory performance); *Horton v. 48th Dist. Ct.*, 446 F. Supp. 2d 756, 761 (E.D. Mich. 2006) (Employee Handbook provided termination for good cause). (PageID.1340-41).

MSU discipline policy which applies exclusively to discipline of tenured faculty for faculty conduct, not administrative titles.  (PageID.1342 citing PageID.699-700).[7]

With respect to the endowed professor title, Plaintiff relies on his Offer Letter, which he labels a "contract," and a separate MSU policy—Revocation of Honors and Awards— concerning the *revocation* of endowed positions.  (PageID.1339).  That policy is inapplicable; Plaintiff does not allege that his endowed professorship was ever *revoked*—it was not *reinstated* upon return to faculty.  (PageID.625, 1339).  The Offer Letter makes clear Plaintiff voluntarily relinquished his endowed professorship when he became Dean.  (PageID.771).  And neither of the policies to which Plaintiff points applies to individuals who, like Plaintiff, relinquished or resigned positions. (PageID.1342, citing PageID.699-700).  Consequently, no deprivation of due process rights exists. Plaintiff cannot manufacture a due process claim by *assuming* what process might have been provided to him had he not voluntarily given up his titles.

Moreover, Plaintiff does not meaningfully address Defendants' argument that, in this case, "a claim for a due-process violation does not lie where the thrust of the plaintiffs' argument is simply breach of contract."  *Kaminski v. Coulter*, 865 F.3d 339, 348 (6th Cir. 2017).  Rather, Plaintiff relies on inapposite cases: involving a "just cause" collective bargaining agreement (*Singfield v. Akron Metro. Hous. Auth.*, 389 F.3d 555 (6th Cir. 2004)); and the revocation of a professor's tenure under a non-contractual, "*de facto*" tenure program (*Perry v. Sindermann*, 408 U.S. 593 (1972)).

---

[7] The Faculty Handbook is clear as to the at-will nature of administrative titles: "All concerned must recognize that assignment as an administrator is subject to change at any time and that at any time the faculty member may return to regular faculty duties in his/her primary academic unit, e.g., department(s), school(s), and/or residential or college(s) not organized by department." *Salary, Appointment, and Faculty Status of Faculty Members Who Assume Administrative Responsibilities – Faculty Handbook*, https://hr.msu.edu/_resources/pdf/faculty-handbook/fac_policy_man.pdf.

**B.      *Plaintiff Has Not Stated a Liberty Interest in His Reputation***

Plaintiff's argument regarding his reputation centers on the alleged lack of a name-clearing hearing, focusing on the supposed role of MSU's General Counsel, Brian Quinn.  Plaintiff does not explain how Quinn has authority to provide a name clearing hearing, even if he were entitled to one.  (PageID.1343).  As already briefed and reiterated below, the reported statements made in the press release are *true* and do not plausibly go beyond "merely improper or inadequate performance, incompetence, neglect of duty or malfeasance."  *Brown v. City of Niota, Tennessee*, 214 F.3d 718, 722 (6th Cir. 2000).  Plaintiff's opinion of what is being *insinuated* or his allegations about what *other* people who are not a Defendant stated are immaterial.[8]

The Sixth Circuit has held that "a name-clearing hearing need only provide an opportunity to clear one's name and need not comply with formal procedures to be valid."  *Chilingirian v. Boris,* 882 F.2d 200, 206 (6th Cir.1989); *Feterle v. Chowdhury,* 148 Fed. Appx. 524, 531–32 (6th Cir. 2005)[9] (only requirement "is the opportunity to be heard; to address the charges against you.").  Plaintiff concedes he has been provided the opportunity to "air publicly the facts and to clear his name."  (PageID.588).  That Plaintiff feels "those efforts have failed" does not impose upon Defendants some requirement to provide Plaintiff continued name-clearing opportunities.  (*Id.*)  Further, Plaintiff was provided an opportunity to be heard when he spoke with OIE and Woodruff and Austin on the day he resigned.

---

[8] Again, Plaintiff *resigned* as Dean and remains a tenured professor; thus, there were no statements made in conjunction with a termination, an essential element to a reputational due process claim. *Chauhan v. Baker*, 865 F.2d 1267 (6th Cir. 1988) (Liberty interest claim for director position dismissed where plaintiff remained a tenured professor).

[9] Unpublished cases attached as **Exhibit A**.

## IV. PLAINTIFF'S MATERIALLY CHANGED EQUAL PROTECTION CLAIM FAILS

Plaintiff has materially changed his equal protection claim in his opposition brief, alleging now it is based on his inclusion in the "protected class" of "MSU administrators who allegedly failed to report allegations under MSU's RVSM Policy," and that he was treated differently than others within his group. (PageID.1344). First, "the class-of-one theory of equal protection does not apply in the public employment context." *Engquist v. Oregon Dep't of Agr.*, 553 U.S. 591, 598, 605 (2008) ("To treat employees differently is not to classify them in a way that raises equal protection concerns.").

Even so, Plaintiff's alleged class is not historically protected; thus, Plaintiff must demonstrate Defendants lacked rational basis for the action, "by negativing every conceivable basis which might support the government action." *Warren v. City of Athens*, 411 F.3d 697, 711 (6th Cir. 2005). Differential treatment must be "so unrelated to the achievement of any combination of legitimate purposes that the court can only conclude that the [government actor's] actions were irrational." *TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cnty., Ohio,* 430 F.3d 783, 788 (6th Cir. 2005). One rational basis for the actions Plaintiff challenges is obvious—to ensure allegations of sexual misconduct are properly investigated. Plaintiff has not overcome his heavy burden under rational basis scrutiny.

Plaintiff concedes he has not stated an equal protection violation against Schmidtke, Towe, Quinn, Jeitschko, or Austin and ignores Defendants' argument that his allegations based on "information and belief" must be disregarded. (PageID.618-19); *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 506 (6th Cir. 2013) (allegations upon "information and belief" insufficient). Moreover, Plaintiff cannot point to any other administrator, let alone a dean, found to have violated the Reporting Protocol and committed other leadership failures who was

treated differently.  Indeed, the QE Report he cites states that "[n]one of the nineteen cases" reviewed "involved a dean-respondent" (PageID.712), and it considered two administrators who, like Plaintiff, *did lose* their administrative titles and positions after a reporting failure. (PageID.712-13).  Plaintiff has not adequately alleged differential treatment at all.

## V.   PLAINTIFF'S STATE LAW CLAIMS MUST BE DISMISSED

Defendants are entitled to qualified immunity under Michigan law where, as here, the conduct at issue was: (1) within the scope of their employment authority; (2) undertaken in good faith without malice; and (3) discretionary.  *Kreipke v. Wayne State Univ.,* 807 F.3d 768, 784 (6th Cir. 2015).

### A.   *Tortious Interference With Contract*

Plaintiff does not explain how Woodruff acted "solely for [her] own benefit with *no benefit* to the corporation."  *Maiberger v. City of Livonia*, 724 F. Supp. 2d 759, 772 (E.D. Mich. 2010). Indeed, he omits his original theory from his Amended Complaint – that Woodruff was motivated to become the next President.  With such abandonment, he has conceded his tortious interference claim.

Plaintiff alleges Woodruff's unilateral "removal" of Plaintiff from the Dean role is a breach, but such a theory fails because: (1) he *resigned*; (2) his role was at-will; and (3) his allegation Defendant Stanley played *no part* in decision-making (PageID.1345) contradicts his allegations that Stanley "agreed with," "endorsed," and "fully supported" her actions and the QE Report he cites which found she consulted with him several times.  (PageID.610, 626, 649). Woodruff was not "wearing the hat of an outsider" and—conceding that Woodruff received support, information and recommendations in making determinations—Plaintiff has not alleged her interests and the interests of the University "are not aligned."  *Servo Kinetics, Inc. v. Tokyo Precision Instruments Co.,* 475 F.3d 783, 801 (6th Cir. 2007).  Nor does Plaintiff reasonably

dispute the benefit provided to the University in assuring there are consequences for leaders who do not meet University expectations, including mandatory reporting obligations.

At best, if Plaintiff is arguing his failure to receive an endowed professorship is a breach of contract, any "contract damages are deemed sufficient and tort remedies are unwarranted." *Indusource, Inc. v. Sandvik Tooling France S.A.S.,* 2016 WL 6216003, at *7 (E.D. Mich. Oct. 25, 2016).  Plaintiff's pleading failures cannot allow improper claims to survive.

### B.  Aiding and Abetting Tortious Interference

Plaintiff's failed tortious interference claim forecloses his aiding and abetting claim; he fails to cite any case from a Michigan court recognizing such a claim; and any such claim concerning Plaintiff's "removal" as Dean fails, as he resigned.

Aside from conclusory allegations, Plaintiff has not pled that Defendants Jeitschko, Stanley, Austin, Guerrant, Quinn, Schmidtke, and Towe knowingly aided and abetted any of Woodruff's alleged conduct, as he does not identify specific knowledge each may have had.[10] Plaintiff ignores that an aiding and abetting claim requires more than "suspicion of wrongdoing," or that Defendants "knew or should have known" of Woodruff's allegedly illegal motivations, which he no longer asserts she possessed.  *Fremont Reorganizing Corp. v. Duke*, 811 F. Supp. 2d 1323, 1346 (E.D. Mich. 2011) (citations omitted); *El Camino*, 722 F.3d 875, 923 (W.D. Mich. 2010).

---

[10] Plaintiff raised numerous new allegations concerning Austin in his opposition brief not in his Amended Complaint, including the incorrect argument that Austin is the "FASA Administrator" within the QE Report and that she engaged in various conduct in June of 2022. (PageID.1381 n. 1, 1318, 1324, 1332).  Plaintiff may not amend his pleading through an opposition brief.  *Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 483 (6th Cir. 2020).  Moreover, Austin *was not part of FASA in June 2022*.  It is public knowledge that Austin transitioned into her role within FASA in July of 2022.  See https://msutoday.msu.edu/news/2022/ann-austin-appointed-new-role?category=business.  Finally, these falsities are also *irrelevant* to Plaintiff's actual legal claims.

Instead, Plaintiff regurgitates Defendants' reasonable actions performed in the course of their job duties (i.e., actions entitled to qualified immunity), alleging they *happened* to assist or justify Woodruff's actions.  As to Jeitschko, Austin, and Quinn, Plaintiff states Woodruff "could not have" carried out the actions without them.  (PageID.1346).  The Amended Complaint remains devoid of any plausible factual allegations in that regard.  Plaintiff's argument is also belied by the plain language of his Offer Letter and his resignation.

Plaintiff also fails to explain how authoring an internal FASA recommendation memorandum (Austin), merely working in Woodruff's office (Jeitschko), and providing confidential legal guidance—the details to which, if provided, Plaintiff was never privy (Quinn)—is more than "general aid" to the alleged tortfeasor and instead action that proximately caused a tort.  *El Camino*, 722 F. Supp. 2d at 910-11, 14; *Fremont Reorganizing Corp. v. Duke*, 811 F. Supp. 2d 1323, 1347 (E.D. Mich. 2011) ("substantial assistance means something more than merely providing routine professional services that aid the tortfeasor.").  Plaintiff's argument—without plausible factual allegations—that Austin, Quinn, and Guerrant sought to "cover up" Woodruff's actions or that Stanley and Jeitschko voiced support could not have proximately caused the alleged tort as such purported acts are alleged to have occurred *after* Plaintiff's resignation.

As to Schmidtke and Towe, Plaintiff's allegation that they "knew" he would face serious consequences after OIE's reporting failure memorandum (PageID.1347) is at best speculative, given OIE recommended only training (PageID.1025).  Even if they thought he may face other consequences, Plaintiff does not allege they knew of any improper motivation of Woodruff, nor could they, as their investigation *preceded* Woodruff's actions.  Further, OIE's investigation into another individual—the administrator who Plaintiff did not report—concluded *after* Plaintiff's

resignation and could not have caused the alleged tort.  Plaintiff's aiding and abetting claim should be dismissed as to all Defendants.

### C.      Defamation

Plaintiff's defamation claim remains irredeemably flawed.  First, as Dean of the Broad School of Business, Plaintiff, who held the "discretionary power in matters of public interest[,] qualifies as a public official." *Grossman v. Smart*, 807 F. Supp. 1404, 1408 (C.D. Ill. 1992). Plaintiff does not address *Grossman*; rather he cites an inapposite and distinguishable case addressing whether an adjunct professor, who did not hold an administrative position, was a *limited-purpose* public figure. *Hutchinson v. Proxmire*, 443 U.S. 111, 134 (1979).  Plaintiff also fails to acknowledge that public figures include those who are "drawn into a particular public controversy," not just those who inject themselves voluntarily. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974); *Dameron v. Washington Mag., Inc.*, 779 F.2d 736, 742 (D.C. Cir. 1985) (holding that the plaintiff was a "public figure" because he was "a central figure, *however involuntarily*, in the discrete and specific public controversy with respect to which he was allegedly defamed" (emphasis added)).

Second, to overcome governmental immunity, Plaintiff still must, but does not, plausibly allege that the defamation was the result of actual malice and that it caused cognizable economic damages.  *See Kreipke*, 807 F.3d 768, 784 (dismissing defamation claim against university president where no facts to support president "acted with a malicious intent").  Plaintiff's resignation from a presumably voluntary board is insufficient. *Heike v. Guevara*, 654 F. Supp. 2d 658, 676 (E.D. Mich. 2009) (dismissal where no economic loss alleged).  And Plaintiff's allegation that the University's press release "implied" criminal misconduct, without more, is speculative and insufficient to support defamation *per se*.  (PageID.1348).  At a minimum, Plaintiff concedes he does not allege any special harm from anything aside from the press statement, thus all other

aspects of his claim should be dismissed.  Finally, he cannot point to any allegations causally tying his alleged resignation from a voluntary board to any specific defamatory statement.

Plaintiff also remains unable to point to any statement within the press release that was false, so he mischaracterizes the statement and, in conclusory fashion, alleges malice in a vain attempt to manufacture a claim.  Plaintiff also relies upon statements by the Lansing State Journal and media, who are not defendants in this litigation.  Yet, Plaintiff fails to identify which of the allegedly false statements in the press statement are attributable to which Defendant.  Instead, Plaintiff has reimagined the content and veracity of the press release (PageID.1319), arguing that it stated he:

- "lacked 'integrity and professionalism.'"
  - *Actual statement* (PageID.793): "Those who take on leadership roles at MSU are expected to conduct themselves with careful and consistent attention to integrity and professionalism." (True, *see* Mandatory Reporting Protocol, PageID.986-1020).

- "failed as a leader."
  - Not stated.

- "exercised 'poor administrative oversight.'"
  - *Actual statement:* "This leadership transition is the result of poor administrative oversight, including a failure to adhere to our mandatory reporting guidelines." (True, *see* OIE Memo, PageID.1025).

- "voluntarily resigned as Dean for covering up a RVSM violation."
  - *Actual statement*: Plaintiff "submitted his resignation" and "resigned amid concerns about his leadership of the college and also a failure to report under our mandatory reporting policies." (True, *see* Plaintiff's resignation, PageID.1032 and OIE Memo PageID.1025).

- "facilitated another Larry Nassar situation with a similarly 'devastating impact.'"
  - *Actual statement and/or opinion*: "Our recent history underscores the significance of a failure to report and the devastating impact it can have on individuals across our campus and beyond."

Plaintiff otherwise largely ignores Defendants' numerous legal arguments why his defamation claim fails, speculating instead that Defendants *must have been* negligent or malicious

in their statements because: (1) he disagrees he lacked professionalism; and (2) his circumstance was "incomparable to Nassar's"—to whom no Defendant is alleged to have ever compared Plaintiff.  (PageID.1348).

If Plaintiff is arguing that the press release created a defamatory implication, "claims of defamation by implication, which by nature present ambiguous evidence with respect to falsity, face a severe constitutional hurdle" that he has not satisfied in this pleading.[11]  *Locricchio v. Evening News Ass'n*, 476 N.W.2d 112, 129 (Mich. 1991) (plaintiffs failed to carry burden to show that it was defamatorily implied they were members of organized crime); *Patton Wallcoverings, Inc. v. Kseri*, 2015 WL 3915916, at *6 (E.D. Mich. June 25, 2015) (granting motion to dismiss where even if the release laid out all details in their entirety, "the reader would draw that very same conclusion"); *Siddiqui v. Gen. Motors Co.,* 2012 WL 335680, at *5 (Mich. Ct. App. Feb. 2, 2012) (same; implication was too "tenuous").

Plaintiff does not materially respond to Defendants' arguments that: (1) Guerrant did not play any role in the underlying investigation or decisions or have reason to believe the press statement was false; and (2) Jeitschko's and Woodruff's statements after the press release were either true or, at most, subjective statements of opinion.  *See Kevorkian v. Am. Med. Ass'n*, 602 N.W.2d 233, 236 (Mich. Ct. App. 1999).

As it relates to Towe, Plaintiff concedes he cannot point to any false statement.  He now argues Towe "likely" knew the OIE memo was "misleading" because it "omitted" that individuals told Plaintiff they were going to report to OIE.  (PageID.1348, Plaintiff also inserts Schmidtke into

---

[11] Specifically, Plaintiff argues the press statement "implied his purported cover up of sexual misconduct was comparable to the Nassar situation," (PageID.1348) and that, due to the press release, *other* media outlets allegedly reported "Gupta himself engaged in sexual misconduct." (PageID.1319).

his brief, but there is no claim of defamation against Schmidtke.  (PageID.634)).  To be sure, the memorandum *does state*—on three occasions—that Plaintiff was informed the subordinates who reported to him were "taking care of it"; that "OIE reports would be filed"; and that "behavior would be reported to OIE".  (PageID.1023-25).  Plaintiff has not identified any false statement by Towe, the memorandum was not public facing or to a third party, and it was prepared in the context of Towe's work-related duties as an investigator.

Plaintiff's failure to allege plausible facts that would demonstrate actual malice, falsity, or material factual omissions in any statement made by a Defendant is fatal and his defamation claim must be dismissed.  *Nichols v. Moore*, 396 F. Supp. 2d 783, 796–97 (E.D. Mich. 2005), *aff'd*, 477 F.3d 396 (6th Cir. 2007).

Respectfully submitted on the 15th of September 2023,

/s/ Scott R. Eldridge
Scott R. Eldridge
Ashley N. Higginson
Miller Canfield Paddock & Stone PLC
120 N Washington Sq., Ste. 900
Lansing, MI 48933
(517) 483-4912
eldridge@millercanfield.com
higginson@millercanfield.com
*Counsel for Defendant Quinn*

/s/ Steven F. Stapleton (with permission)
Steven F. Stapleton
Maria Cesira Fracassa Dwyer
Clark Hill PLC (Grand Rapids)
200 Ottawa Ave., NW, Ste. 500
Grand Rapids, MI 49503
(616) 608-1145
Fax: (616) 608-1159
sstapleton@clarkhill.com
mdwyer@clarkill.com
*Counsel for Defendants Schmidtke and Towe*

/s/  Patrick J. Hickey (with permission)
Patrick J. Hickey
Hickey, Hauck, Bishoff, Jeffers & Seabolt PLLC
One Woodward Ave., Ste. 2000
Detroit, MI 48226
(313) 964-9079
phickey@hhbjs.com
*Counsel for Defendant Board of Trustees and Defendants Byram, Kelly, Pierce, Scott, Tebay and Vassar*

/s/  Charyn K. Hain (with permission)
Charyn K. Hain
Varnum LLP (Grand Rapids)
Bridgewater Place
333 Bridge St., NW
P.O. Box 352
Grand Rapids, MI 49501-0352
(616) 336-6297
ckhain@varnumlaw.com
*Counsel for Defendant Stanley*

*/s/ Uriel Abt (with permission)*
Uriel Abt
Law Office of Uri Abt PLLC
517 Wildwood Dr.
East Lansing, MI 48823
(517) 858-9410
uri@abtlawfirm.com
*Counsel for Defendant Guerrant*

*/s/ Ariel S. Cohen (with permission)*
Ariel S. Cohen
Squire Patton Boggs LLP (Columbus)
2000 Huntington Center
41 South High Street
Columbus, OH 43215
(614) 365-2700
Fax: (614) 365-2499
ariel.cohen@squirepb.com
*Counsel for Defendant Austin*

*/s/ Adam Hollingsworth (with permission)*
Adam Hollingsworth
Jones Day (Cleveland)
North Point
901 Lakeside Ave.
Cleveland, OH 44114-1190
(216) 586-7235
ahollingsworth@jonesday.com
*Counsel for Defendant Jeitschko*

*/s/  Roger Lee Wotila (with permission)*
Roger Lee Wotila
McCurdy Wotila & Porteous PC (Cadillac)
120 W Harris St.
Cadillac, MI 49601
(231) 775-1391
Email: roger@mwplegal.com
*Counsel for Defendant Knake Jefferson*

*/s/  Muneeb M. Ahmad (with permission)*
Muneeb M. Ahmad
Ahmad & Akbar Law PLLC
811 N Main St., Ste. 301
Royal Oak, MI 48067
(248) 519-2313
muneeb@ahmadandakbar.com
*Counsel for Defendant Denno*

*/s/ Paul Krieger (with permission)*
Krieger Kim & Lewin LLP
350 Fifth Ave., Ste. 7710
New York, NY 10118
(212) 390-9552
paul.krieger@kklllp.com
*Counsel for Defendant Woodruff*

## **CERTIFICATE OF SERVICE**

I hereby certify that on September 15, 2023 I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to all attorneys of record.

*/s/ Scott R. Eldridge*
Scott R. Eldridge
Miller Canfield, PLC
*Counsel for Defendant Quinn*

**<u>CERTIFICATE OF COMPLIANCE</u>**

As required under L. Civ. R 7.2(b)(i), I hereby certify this brief includes 4,282 words or less, including headings, footnotes, citations, and quotations and not including the case caption, cover sheets, any table of contents, any table of authorities, the signature block, attachments, exhibits, and affidavits.  This word count was generated by Microsoft Word 2010, the processing software utilized to draft the brief.

*/s/ Scott R. Eldridge*
Scott R. Eldridge
Miller Canfield, PLC
*Counsel for Defendant Quinn*

*Exhibit A*

Feterle v. Chowdhury, 148 Fed.Appx. 524 (2005)

203 Ed. Law Rep. 506, 2005 Fed.App. 0792N

⚑  KeyCite Yellow Flag - Negative Treatment
Distinguished by  Way v. Shawnee Township,   N.D.Ohio,   June 20, 2016

148 Fed.Appx. 524
This case was not selected for
publication in West's Federal Reporter.
See Fed. Rule of Appellate Procedure 32.1 generally
governing citation of judicial decisions issued on or after
Jan. 1, 2007. See also U.S.Ct. of App. 6th Cir. Rule 32.1.
United States Court of Appeals,
Sixth Circuit.

Lynn FETERLE, Plaintiff–Appellant,
v.
Aminur Raj CHOWDHURY; Ruby L. Marks;
Carol Cartwright, Defendants–Appellees.

No. 04–3920.
|
Sept. 14, 2005.

**Synopsis**

**Background:** Assistant professor sued state university under § 1983, claiming violations of his First and Fourteenth Amendment rights in connection with a decision to terminate his employment. The United States District Court for the Northern District of Ohio granted summary judgment against the professor, and he appealed.

**Holdings:** The Court of Appeals held that:

[1] any Fourteenth Amendment Due Process requirement for a name-clearing hearing was satisfied;

[2] the professor's speech was not protected by the First Amendment; and

[3] the professor could not show any causal link between his speech and the alleged adverse action.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

West Headnotes (3)

[1]  **Constitutional Law** 🔑 Reputational interests, protection and deprivation of

**Education** 🔑 Notice and hearing

**Public Employment** 🔑 Requisites and sufficiency of hearing

Any Fourteenth Amendment due process requirement for a name-clearing hearing in connection with the discharge of an assistant professor at state university was satisfied by the numerous internal appeals he pursued within the university, even though he was not given the names of his accusers and the witnesses who provided information in a report by an affirmative action office. U.S.C.A. Const.Amend. 14.

3 Cases that cite this headnote

[2]  **Constitutional Law** 🔑 Discharge

**Education** 🔑 Exercise of rights;  retaliation

**Public Employment** 🔑 Protected activities

Speech of an assistant professor at state university regarding airport safety was not protected by First Amendment, thus defeating his claim that he was discharged in retaliation for exercising his First Amendment rights; speech was entirely internally directed, and he raised the safety concerns only to amplify what were at bottom complaints about a coworker's poor job performance and a dean's management decisions. U.S.C.A. Const.Amend. 1.

4 Cases that cite this headnote

[3]  **Constitutional Law** 🔑 Discharge

**Education** 🔑 Exercise of rights;  retaliation

**Public Employment** 🔑 Causal connection;  temporal proximity

Assistant professor at state university failed to show any causal link between speech allegedly protected by First Amendment and denial of tenure, thus defeating his claim that he was discharged in retaliation for exercising his First

Feterle v. Chowdhury, 148 Fed.Appx. 524 (2005)
203 Ed. Law Rep. 506, 2005 Fed.App. 0792N

Amendment rights; his complaint against a dean was made more than a year before a report by an affirmative action office was inserted into his file, at which point the most recent complaints about a coworker's competence were four months old, and the two final decision-makers made their evaluations of the professor based purely on his scholarly work and he presented no evidence of pretext. U.S.C.A. Const.Amend. 1.

2 Cases that cite this headnote

**\*525** On Appeal from the United States District Court for the Northern District of Ohio.

**Attorneys and Law Firms**

David J. Kovach, Janik & Dorman, Cleveland, OH, for Plaintiff–Appellant.

Louis J. Licata, Licata & Associates, Independence, OH, Daniel L. Bell, Kyle S. Scheatzle, Brouse & McDowell, Akron, OH, for Defendants–Appellees.

Before BOGGS, Chief Judge; GIBBONS, Circuit Judge; and QUIST, District Judge. \*

**Opinion**

PER CURIAM.

**\*\*1** Lynn Feterle appeals from the district court order dismissing his ⚑ 42 U.S.C. § 1983 claim on summary judgment. He claims that 1) he was denied a name-clearing hearing in violation of the Fourteenth Amendment, and 2) he was discharged for engaging in speech protected by the First Amendment. The district court concluded that any requirement for a name-clearing hearing was satisfied by the numerous internal appeals Feterle pursued within the University. The court also concluded that Feterle did not suffer an adverse employment action based on protected First Amendment speech, and that he could not show any causal link between his speech and the alleged adverse action. We affirm for the same reasons.

I

Feterle, an Assistant Professor of Aeronautics at Kent State University's School of Technology, filed this ⚑ 42 U.S.C. § 1983 action claiming violations of his First and Fourteenth Amendment rights in connection with Kent State's decision to terminate his employment. The School of Technology is part of Kent State's regional campus system. He named three defendants: **\*526** Cartwright (president of Kent State), Chowdhury (dean of the School of Technology), and Marks (director of the Office of Affirmative Action).

Feterle was appointed to the School of Technology's faculty for the 1996–97 school year. At that time, he became eligible to serve a probationary period of up to six years, at the end of which he would be up for tenure. Thus, Feterle would have been eligible for tenure at the beginning of the 2001–02 school year. However, he was not reappointed during the 2000–01 school year, despite the fact that he had been successfully reappointed in the past. According to Feterle, he was not reappointed because Chowdhury unlawfully retaliated against him for exercising his First Amendment rights. Feterle also alleges that he was deprived of his right to a name-clearing hearing in violation of the Fourteenth Amendment. A dispute between Feterle and Chowdhury occurred in August 1999 when Feterle and several others contacted the Vice–Provost for Kent State's regional campus system, Dr. Gordon Keller, and requested an early review of Chowdhury's performance as dean. The request was premised on the allegation that Chowdhury failed to perform his duties adequately. Keller declined to conduct an early review of Chowdhury's performance. Chowdhury was reappointed for the following year.

In April 2000, Feterle and others took a secret vote expressing no confidence in one of Feterle's coworkers, Dr. Ruth Sitler, who was the coordinator of the aeronautics division. Apparently, Feterle and the others were concerned about Sitler's job performance. Sitler eventually learned of the vote and wrote a memorandum to the University's administration in which she outlined what she perceived to be abuse from her colleagues. In essence, Sitler claimed that she was the victim of a hostile work environment occasioned by Feterle and another faculty member, John Duncan. Later that month, Sitler filed a complaint with the Office of Affirmative Action (the "OAA"), alleging that she suffered hostility based on her gender, age, and race. Marks, as Director of the OAA, investigated the complaint.

**\*\*2** In May 2000, Duncan wrote a letter to Cartwright about what he believed were safety issues at Kent State's Airport. This letter eventually led to a request from Chowdhury that Duncan provide facts to support his concerns about the safety issues. Duncan, in response to Chowdhury's request, revealed that he was concerned that Sitler's cognitive abilities were declining. Feterle concurred in the portions of the letter that provided background information and examples of Sitler's allegedly problematic behavior.

In August 2000, after completing a two-month investigation into Sitler's allegations, Marks provided Chowdhury with her conclusions and recommendations (the "OAA Report"). The OAA Report, which is central to the parties' dispute in this matter, found that Sitler had made a prima facie case of discrimination. The OAA had investigated Sitler's allegations of age, race, and gender discrimination, along with her allegations of hostile work environment and found validity to her claims. It also stated that "[s]ome faculty have used the cover of First Amendment rights as a pretext to cover direct evidence of discriminatory behavior on their parts." It also found peculiar the fact that Sitler's performance had been commended by the University administration, yet denigrated by her peers. In short, the OAA Report found that there was evidence of discrimination, as well as evidence of a hostile work environment. It found that the "egregious examples of hostility" violated Kent State's policy regarding the faculty's code **\*527** of professional ethics. The OAA Report concluded with several recommendations to remedy the discrimination and eliminate the hostile work environment. The OAA Report did not identify any offenders by name.

In September 2000, Chowdhury sent a letter to the faculty and staff of the School of Technology. The letter served to alert the staff of the specific findings in the OAA Report and to inform them of the recommendations that were listed in the report. The letter stressed the seriousness of this matter and Chowdhury's commitment to resolving these problems. The letter was carbon copied to Provost Paul Gaston ("Gaston" or "Provost Gaston"), Vice–Provost Keller, and an advisory committee comprised of faculty from the School of Technology.

Also in September 2000, the School of Technology Reappointment, Promotion, and Tenure Committee (the "School RPTC") prepared to review Feterle's employment file for reappointment. The School RPTC provided the initial

faculty review of a candidate. Chowdhury, as dean, was responsible for providing the School RPTC with the list of persons up for review and instructing the committee on its responsibilities during the review process. Pursuant to University procedure, the candidate up for review must put together the file that the School RPTC is to review. Feterle, in keeping with this procedure, submitted his file to Chowdhury for presentation to the School RPTC. According to Feterle, Chowdhury stated that he would review Feterle's file page-by-page. Feterle also claims that Chowdhury made a statement regarding how Feterle had "tried to get him fired" the previous year.

**\*\*3** Chowdhury placed the OAA Report in the files of both Duncan and Feterle along with several other documents. On September 28, 2000, Chowdhury sent a letter to Vice–Provost Keller stating that he included the OAA Report and other documents in the files of both teachers because of the serious nature of the allegations, and because of Kent State's policy of evaluating employees in terms of whether the person is likely to make a positive contribution to Kent State and its community over the long term.

Feterle was advised of Chowdhury's decision by carbon copy of Chowdhury's letter to Keller. On September 29, 2000, Feterle acknowledged his receipt of Chowdhury's letter to the School and objected to the inclusion of the OAA Report in his reappointment file.

On October 17, 2000, Feterle sent a letter to Vice–Provost Keller. In this letter, Feterle stated he was now aware that the offending material would be included in his reappointment file. He stated that the OAA Report was "untrue, biased, prejudicial, and slanderous...." There is no dispute that Feterle was advised that the OAA Report would be reviewed by the School RPTC in connection with his reappointment. The review process was even temporarily halted at the request of Feterle's union representative. Nevertheless, Feterle chose not to respond to the allegations contained in the OAA Report on the advice of his union.

In late 2000, the School RPTC reviewed Feterle's file and voted against his reappointment. The School RPTC s overall review of Feterle's performance focused on three areas—scholarship of teaching, scholarship of discovery/integration/application, and university citizenship. With respect to scholarship of teaching, the School RPTC noted that there were commendable aspects to Feterle's teaching, but it also noted that he had not followed up on the School RPTC's

previous recommendations that he make a concerted effort **\*528** to obtain peer reviews and that he integrate more innovative strategies into his teaching.

With respect to the area regarding scholarship of discovery/integration/application, the School RPTC members expressed opinions ranging from "not exceptionally strong" to "relatively weak," and "sufficient." The School RPTC expressed concern in this area because Feterle had again not followed through on prior School RPTC recommendations to put forth more effort into scholarly activities. The School RPTC noted that Feterle's efforts in this area were not strong, but that they were probably at least adequate.

Lastly, in the area of university citizenship, the School RPTC made mention of Feterle's limited work in curriculum, development, advising, and committee work. The members also questioned Feterle's degree of collegiality. Again, they noted that Feterle had failed to follow through on previous recommendations. The School RPTC was also concerned about the OAA Report. Without attempting to determine Feterle's "guilt or innocence," the committee members were bothered by the fact that their deliberations were deferred at Feterle's request, yet he did not respond to the additional material inserted into his file. One member in particular was cognizant of the fact that Feterle may have been cautioned by counsel to not respond, and this member felt that the file should have reflected that fact. The members seemed in consensus that the OAA's findings were not suggestive of an environment that was conducive to congeniality and productivity.

**\*\*4** Ultimately, the School RPTC recommended against reappointment, and Chowdhury accepted the recommendation. In a letter to Keller, Chowdhury provided the reasoning of the School RPTC. Chowdhury's letter to Keller was again provided to Feterle by way of copy. In response to this letter, Feterle requested the opportunity to appeal Chowdhury's decision. In doing so, Feterle outlined what he considered to be procedural and factual errors regarding his reappointment. He provided Keller with those portions of Chowdhury's letter that he felt were misleading, and he set forth his objections. In his nine-page letter to Keller, Feterle clarified his position by denying that he was involved in any discriminatory conduct and claimed that he had attempted to incorporate the School RPTC's recommendations from previous years into his teaching.

Keller sought input from the Regional Campus Reappointment, Promotion, and Tenure Committee ("Regional RPTC"), which is comprised of faculty members from the regional campuses. Feterle also had a meeting with the Regional RPTC to discuss his reappointment. At this meeting, he informed the evaluators that the OAA Report was untrue as it related to him. The Regional RPTC recommended that Feterle be reappointed for another year. This time, the evaluators' comments about Feterle were favorable. For instance, one evaluator found that the OAA Report was sloppy and filled with innuendo. This same evaluator felt that Feterle was denied reappointment on the basis of hearsay. Another evaluator, echoing the same sentiments, found that the OAA Report was poorly written and did not provide specific charges against specific individuals.

Nevertheless, Vice–Provost Keller decided against reappointment. In a letter to Feterle, Keller outlined the basis for his decision. He initially noted that the School RPTC did not give Feterle favorable reviews and he felt that these recommendations carried considerable weight because the assessments came from Feterle's colleagues who worked with him on a **\*529** day-to-day basis. Keller also outlined the School RPTC's concerns regarding Feterle's disregard of committee comments from previous years and its concerns about Feterle's limited involvement in other important areas.

Unlike the Regional RPTC, Keller did consider the charges in the OAA Report credible. According to Keller, he had knowledge that Feterle was directly linked to the findings. He admitted that he gave serious consideration to the Regional RPTC's recommendations, but stated that his knowledge of what he considered the "harassing behaviors" Feterle displayed toward Sitler made it impossible for him to recommend reappointment. Keller also informed Feterle that he had the right to include, within five working days, a letter in his file that addressed any procedural errors or other errors of fact. Keller's letter also served to inform Feterle that he had ten working days to appeal the decision to Provost Gaston.

**\*\*5** Feterle subsequently sent a letter to Associate Provost Dr. James P. Louis advising Louis of his decision to appeal Vice–Provost Keller's recommendation against reappointment. Feterle also provided Louis with his statement of procedural and factual errors, and he requested that, pursuant to University policy, this statement be included in his file. Louis sent a letter to Feterle acknowledging receipt of his statement and stating that Feterle would be permitted a thirty-minute meeting with Provost Gaston. In a subsequent letter

to Gaston regarding his appeal, Feterle denied the allegations in the OAA Report and stated his willingness to respond to the accusations.

On May 2, 2001, Feterle met with Gaston. The primary topic at this meeting was Feterle's academic qualifications. The OAA Report was not discussed because the meeting was limited primarily to academic considerations. Ultimately, Provost Gaston decided against reappointment. In his letter to Feterle advising him of this, Gaston did not mention the OAA Report. Rather, his reason for deciding against reappointment was based on his opinion that Feterle had "not satisfactorily engaged in scholarship efforts in any form." According to Gaston, Feterle's "understanding of and appreciation for scholarship as defined in Kent State criteria and by consensus within higher education" was inadequate. Gaston informed Feterle of his right to appeal the decision to President Cartwright, or to request a hearing from the Joint Appeals Board (the "JAB"), which would review the matter and then make a recommendation to Cartwright.

Feterle requested a hearing from the JAB. The hearing was held on September 21, 2001. The JAB found that procedural errors occurred in the reappointment process and that those errors had a potentially adverse influence on the outcome of the review. According to the JAB, there were four procedural errors. First, the JAB found that the School RPTC was not appropriately constituted. It found that Duncan, a member of the committee, was not allowed to vote, while another professor who was not a member of the advisory committee was allowed to vote. Second, the JAB found that the School RPTC's chair memo was written before all the votes were in and that some of the committee members appeared to have voted before the meeting was held. Third, the JAB noted that Feterle was not mentioned in the OAA Report and that Chowdhury introduced the report to Feterle's file a mere one day before the committee was scheduled to meet. Further, it noted that there was no documentation that Chowdhury informed Feterle of his right to review the materials added to the file, or that Feterle had the opportunity to include **\*530** written comments relevant to the material added to his file. Lastly, the JAB found that the School RPTC committee was influenced to some extent by the OAA Report. Ultimately, the JAB recommended that Feterle be reappointed for another year.

Cartwright, however, rejected the JAB's recommendation. In a meeting with the JAB, Cartwright asked the board whether the procedural errors they had identified had

any impact on Provost Gaston's decision not to reappoint Feterle based on his academic ability. The JAB told Cartwright that none of the procedural errors they identified affected Gaston's academic judgment of Feterle's ability. In deciding against reappointment, Cartwright found that Gaston had used the appropriate standards in evaluating Feterle's academic performance. She also noted that Gaston had given Feterle an opportunity to meet in person and discuss his academic performance. Despite this fact, as Cartwright noted, Gaston had determined that Feterle's academic accomplishments were insufficient. Cartwright also noted Gaston's determination that Feterle had not "exhibited a stable pattern of performance that fell within the range of activities constituting positive University Citizenship." Ultimately, Cartwright found nothing arbitrary or capricious in Gaston's reasoning, and she found no evidence that Feterle was prejudiced by the procedural errors the JAB identified.

**\*\*6** With respect to the OAA Report, Cartwright noted that the JAB failed to identify any procedure that was violated by the inclusion of the report in Feterle's file. Moreover, she noted that the JAB failed to show how the OAA Report influenced Gaston's decision, which was made on the basis of Feterle's academic abilities and contained no mention of the report. Cartwright concluded by noting that Provost Gaston's decision was premised on Feterle's academic abilities only and that it was conducted in accordance with the appropriate academic standards. She noted that "[n]othing in the record indicates that [Feterle was] deprived of a full and fair review of [his] qualifications for reappointment, or established that the Provost's decision was arbitrary and capricious."

After receiving notice of Cartwright's decision, Feterle filed a grievance under the Collective Bargaining Agreement, and a two-day arbitration hearing was held. The substance of the OAA Report was not addressed, but the process afforded to Feterle during his reappointment process was. The arbitrator's ultimate conclusion was that no prejudicial procedural error had occurred in the reappointment process and affirmed Cartwright's decision to not reappoint Feterle.

On August 15, 2002, Feterle initiated this suit. He brought two causes of action: a First Amendment claim against Chowdhury in his individual capacity and claim that he was denied his Fourteenth Amendment right to a name-clearing hearing. The district court granted summary judgment for the defendants on both claims on June 17, 2004.

II

We review the grant of a motion for summary judgment *de novo,* taking facts in the light most favorable to the non-moving party. *Shamaeizadeh v. Cunigan,* 338 F.3d 535, 543–44 (6th Cir.2003). "Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law." *Bridgeport Music, Inc. v. Dimension Films,* 410 F.3d 792 (6th Cir.2005).

**\*531** III

**[1]** Feterle argues that his Fourteenth Amendment rights were violated because he did not receive a name-clearing hearing. [1] It is well established that a person's reputation and good name are among the liberty interests protected by the Due Process Clause of the Fourteenth Amendment from damage by public government action in connection with a termination of employment or refusal to rehire. *Paul v. Davis,* 424 U.S. 693, 707–08, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *Kendall v. Board of Ed. of Memphis City,* 627 F.2d 1, 5 (6th Cir.1980). Accordingly, the Supreme Court has determined that where a nontenured government employee shows he has been stigmatized by the voluntary, public dissemination of false information in the course of a decision to terminate his employment, the employer is required to afford him an opportunity to clear his name. *Codd v. Velger,* 429 U.S. 624, 627–28, 97 S.Ct. 882, 51 L.Ed.2d 92, (1977) (per curiam). "A name-clearing hearing is required only when a nontenured public employee is dismissed from his or her job and publicly stated reasons that reflect on the terminated employee's honesty or integrity are relied upon, either explicitly or implicitly." *Ferencz v. Hairston,* 119 F.3d 1244, 1250 (6th Cir.1997).

**\*\*7** Assuming, arguendo, that Feterle was entitled to a name-clearing hearing, his claim nonetheless fails because Feterle in fact received numerous hearings sufficient to satisfy the requirements for a name-clearing hearing. A name-clearing hearing requires only that an employee be provided with notice and the opportunity to clear his name and "need not comply with formal procedures to be valid." *Chilingirian v. Boris,* 882 F.2d 200, 206 (6th Cir.1989)

(finding that name-clearing hearing was adequate where employee had only the opportunity to rebut charges at the hearing despite the council's refusal to answer questions submitted by the employee). *See also Gregory v. Hunt,* 24 F.3d 781, 788–89 (6th Cir.1994) (finding that name-clearing hearing was adequate where employee was allowed to speak at an informal hearing and later to submit a written response to the allegations against him). The only real requirement for a name-clearing hearing is the opportunity to be heard; to address the charges against you.

Feterle received a number of hearings, each of which independently satisfied the minimal requirements for a name-clearing hearing:

1. The School RPTC (which initially considered whether to reappoint Feterle). Feterle was informed that the School RPTC would consider the OAA Report. Proceedings were delayed while Feterle was given the opportunity to respond. Feterle chose not to respond, he says, because his union advised him not to.

2. Vice–Provost Keller and the Regional RPTC (Feterle's first appeal). Feterle responded to the OAA Report and concerns about his scholarship in writing to Keller, and met with the RPTC to rebut the OAA Report.

3. Provost Gaston (next appeal). Feterle provided a written statement addressing the OAA Report and other issues, and was **\*532** also given a 30–minute meeting with Provost Gaston to discuss his concerns.

4. Kent State President Cartwright and the JAB (final appeal within the University). Again, Feterle was permitted to submit a written response. He also received a hearing before the JAB to address his concerns.

5. The arbitration. There was a two-day arbitration hearing at which Feterle presented his arguments.

At each of these stages, Feterle was informed of complaints that may have related to him and was given the opportunity to rebut them. Thus, each hearing/appeal provided Feterle with the essential elements of a name-clearing hearing—the opportunity to address the complaints against him.

Feterle's main response is to argue that due process was not satisfied because he was not given the names of his accusers and the witnesses who provided the information in the OAA report. Reply Br. at 8–10. Feterle does not, however, identify

any case law suggesting that such information is required. Indeed, in 🔖 *Chilingirian,* 882 F.2d at 206, we specifically found that the council's refusal to answer questions from the employee at the name-clearing hearing did not violate due process. Feterle also relies upon the collective bargaining agreement, which he argues requires the University to name his accusers. But the collective bargaining agreement cannot be the source of constitutional due process rights. [2] At bottom, the level of process required for a name-clearing hearing is quite low, and each of the five hearings/appeals provided Feterle crosses this low hurdle.

## IV

**\*\*8** **[2]** Feterle's second claim is that he was terminated in retaliation for exercising his First Amendment rights. Specifically, he identifies the following protected speech as having spurred retaliation: 1) participation in a secret no-confidence vote concerning his colleague Sitler, 2) requesting that Keller review Chowdhury's work performance as Dean, 3) raising safety concerns relating to the Kent State University airport to Assistant Dean Scott Layton, and 4) questioning Chowdhury's hiring of a spouse of a member of the University's Board of Trustees to Layton.

The First Amendment protects government employees' right to speak out on matters of public concern without reprisal from their employer. 🔖 *Dambrot v. Central Michigan University,* 55 F.3d 1177, 1185 (6th Cir.1995). To prove a claim of retaliation in violation of the First Amendment, an employee much establish:

> (1) that the plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused the plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity; and (3) that the adverse action was motivated at least in part as a response to the exercise of the plaintiff's constitutional rights.

🔖 *Farmer v. Cleveland Public Power,* 295 F.3d 593, 599 (6th Cir.2002). Furthermore, as this is a claim against Chowdhury in his individual capacity, Chowdhury will be protected by qualified immunity "unless he knew or should have known that his conduct violated clearly established rights."

🔖 *Dominque v. Telb,* 831 F.2d 673 (6th Cir.1987) (citing 🔖 **\*533** *Harlow v. Fitzgerald,* 457 U.S. 800, 815–19, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)).

Like the district court, we conclude that Feterle's First Amendment claim failed because Feterle's speech was not constitutionally protected speech and also because Feterle could not establish causation. We therefore need not reach the question of qualified immunity for Chowdhurry.

## A

It is well established "that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior." 🔖 *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (finding that questionnaire distributed by a employee addressing confidence in supervisors, employee moral, and other grievances was not protected speech). "The mere fact that public monies and government efficiency are related to the subject of a public employee's speech do not, by themselves, qualify that speech as being addressed to a matter of public concern." 🔖 *Barnes v. McDowell,* 848 F.2d 725, 734 (6th Cir.1988) (finding that employee's speech concerning mismanagement is not protected speech). *See also* 🔖 *Brown v. City of Trenton,* 867 F.2d 318, 322 (6th Cir.1989) (finding that letters to a supervisor complaining about police chief's leadership are not protected speech). In short, complaining about your boss and coworkers is not protected by the First Amendment just because you work for the government.

**\*\*9** We conclude that Feterle's speech was not protected by the First Amendment. The fact that Feterle's speech was entirely internally directed, as opposed to informing the public, weighs against First Amendment protection. *See* 🔖 *Connick,* 461 U.S. at 148, 103 S.Ct. 1684 (finding it

relevant that the plaintiff "did not seek to inform the public that the District Attorney's office was not discharging its governmental responsibilities"). All of his concerns about airport safety came in the context of complaints about Sitler's poor job performance (memory lapses, confusion, etc.) and Chowdhury's management decisions (hiring staff, obtaining new airplanes, etc.). Feterle raised these safety concerns only to amplify what are at bottom complaints about job performance. We have held that complaints about police management are not transformed into statements of public concern merely because police are charged with securing the public safety and, thus, poor management could harm public safety. *See* Brown, 867 F.2d at 322. Likewise, we conclude that complaining about the poor management of an airport and university is not a matter of public concern when those complaints are directed only to other government employees and concern the employee's supervisors and coworkers.

B

[3]    To establish causation Feterle offered two pieces of evidence: first, temporal proximity. Feterle's complaint against Chowdhury was more than a year before the OAA Report was inserted into his file, and the most recent complaints about Sitler's competence were four months old at that point. The district court was correct to conclude that this is not meaningful temporal proximity. *See* Cooper v. City of North Olmsted, 795 F.2d 1265, 1272–73 (6th Cir.1986) (finding that discharge four months after filing discrimination claim was insufficient to establish prima facia case of retaliatory discharge). Second, Feterle **534** claims

that Chowdhury told him "you know, you tried to get me fired last year" when Feterle turned in his reappointment file, [3] and that this creates an issue of material fact with respect to causation.

Feterle, however, cannot establish that the insertion of the OAA Report—even if motivated by animus—caused him to be denied tenure. The two final decision-makers in the appeals process were Provost Gaston and President Cartwright. Both made their evaluations of Feterle based purely on his scholarly work. When Gaston met with Feterle, it was to discuss his scholarly work and Gaston subsequently stated that his decision was based on an evaluation of Feterle's scholarship. The University JAB concluded that Gaston's evaluation of Feterle's scholarship was proper, and President Cartwright (the final decision-maker) approved Gaston's decision based strictly on the evaluation of Feterle's scholarship. Feterle has presented no evidence to suggest that this is pretextual, either directly or by showing that similarly situated individuals were treated differently.

V

**10   For the foregoing reasons, we AFFIRM the summary judgment granted by the district court in favor of the defendants.

All Citations

148 Fed.Appx. 524, 2005 WL 2233609, 203 Ed. Law Rep. 506, 2005 Fed.App. 0792N

## Footnotes

*    The Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by designation.

1    He makes this claim as a § 1983 claim against Cartwright, Chowdhury, and Marks in their official capacities. The district court also noted that the complaint was unclear, but treated Feterle's complaint as making a Fourteenth Amendment claim against Chowdhury in his individual capacity as well. Feterle, however, explicitly states in his brief to this court that he is not making a Fourteenth Amendment claim against Chowdhury in his individual capacity. App. Br. at 41.

203 Ed. Law Rep. 506, 2005 Fed.App. 0792N

2    Feterle's reading of the collective bargaining agreement seems somewhat strained, and at best would support an action for breach of contract.

3    This allegation was not made by Feterle until an affidavit two years after the alleged statement was made. At no point during his various appeals within the University system, did Feterle claim that Chowdhury made this statement.

---

**End of Document**                                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   9

2016 WL 6216003
Only the Westlaw citation is currently available.
United States District Court, E.D.
Michigan, Southern Division.

INDUSOURCE, INC., Plaintiff,
v.
SANDVIK TOOLING FRANCE S.A.S., f/k/a Safety
S.A.S., Sandvik, Inc., and Sandvik AB, Defendants.

CASE NO. 16-10056
|
Signed 10/25/2016

**Attorneys and Law Firms**

Stephen M. Judge, John D. Ladue, Ladue Curran & Kuehn, LLC, South Bend, IN, for Plaintiff.

Michael C. Simoni, Miller, Canfield, Detroit, MI, R. Brendan Fee, Morgan Lewis & Bockius LLP, Philadelphia, PA, for Defendants.

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION TO DISMISS (Doc. 17)**

GEORGE CARAM STEEH, UNITED STATES DISTRICT JUDGE

**\*1** In this diversity case, plaintiff Indusource, Inc. ("Indusource"), alleges breach of contract arising out of its exclusive distribution agreement in a five state territory with defendant Sandvik Tooling France S.A.S., formerly known as Safety S.A.S. ("Safety" or "Sandvik Tooling"), by which it marketed and sold Safety's tools used in industrial metal cutting. Indusource has also named as defendants parent company Sandvik AB, and another of its subsidiaries, defendant Sandvik, Inc., for breach of contract under the doctrine of piercing the corporate veil, and for tortious interference with contractual relations. Now before the court is defendant Sandvik AB and Sandvik, Inc.'s (collectively "defendants") motion to dismiss for failure to state a claim and for lack of personal jurisdiction. Defendant Sandvik Tooling has filed an Answer and has not joined in the motion to dismiss. Oral argument was heard on October 20, 2016. For the reasons set forth below, defendants' motion to dismiss shall be denied in part as to the breach of contract claim and

granted in part as to the tortious interference with contractual relations claim.

**I. Background**

Because the court is deciding a motion to dismiss, the facts set forth below are those alleged in the First Amended Complaint.

**A. The Parties**

Plaintiff Indusource is a Michigan corporation with its principal place of business in Michigan. Defendant Sandvik Tooling is a French company with its principal place of business in France. Defendant Sandvik AB is a Swedish company and is a high-tech and global engineering group. Defendant Sandvik, Inc. is a Delaware corporation with its principal place of business in New Jersey. Sandvik Tooling and Sandvik Inc. are subsidiaries of Sandvik AB and are 100 percent owned and controlled by Sandvik AB. Indusource alleges that Sandvik AB operates its subsidiaries Sandvik Tooling and Sandvik, Inc. as mere instrumentalities through which it conducts its global operations. Throughout the First Amended Complaint and in its response to defendants' motion to dismiss, Indusource refers to all three defendants collectively as "Sandvik." When relying on plaintiff's nomenclature, the court shall do the same.

**B. The Wholesale Agreement**

In July, 2010, Indusource and Safety entered into a Wholesale Agreement by which Indusource would distribute, sell, and market Safety products in a five-state territory comprised of Michigan, Ohio, Indiana, Kentucky, and Tennessee. The Wholesale Agreement provides:

> Safety reserves the right to initiate new distribution in the agreed Territory. Safety shall direct any new distributor in the Territory to Indusource to purchase Safety Products. Indusource shall execute sales and marketing of Safety Products to any distributor in the Territory, including to distributors referred, recommended, or directed to Indusource by Safety. All distribution business will be directed and invoiced

Case 1:23-cv-00201-PLM-RSK ECF No. 68, PageID.1476 Filed 09/15/23 Page 33 of 54

Indusource, Inc. v. Sandvik Tooling France S.A.S., Not Reported in Fed. Supp. (2016)

2016 WL 6216003

through Indusource as the single Safety Territory Wholesaler.

(Wholesaler Agreement, ¶ 2). After an automatic five-year extension applied because Indusource met sales targets for 2010 to 2011, the contract now runs until December 31, 2016.

### C. Corporate Restructuring

*2 In 2012, Safety merged with Impero and Pramet to form Impero-Pramet-Safety, known as "IPS." Around this same time Safety merged with another subsidiary of Sandvik AB, Sandvik Tooling France. In 2014, IPS merged with Dormer Tools to create Dormer-Pramet. Indusource claims that it then learned that "Sandvik" decided to sell its products covered by the Wholesale Agreement exclusively under the Dormer-Pramet brand.

### D. Alleged Breach of the Wholesale Agreement

Indusource further alleges that many of the products sold under the Dormer-Pramet brand are identical to Safety-branded products covered by the Wholesale Agreement. As of April 1, 2015, Indusource claims that "Sandvik" had begun selling Dormer-Pramet brand products identical to Safety-branded products covered by the Wholesale Agreement. Indusource claims that "Sandvik" has distributed Dormer-Pramet products in Indusource's territory through 125 distributors, but has not directed or invoiced this business through Indusource. In their motion to dismiss, defendants claim that the Wholesale Agreement limits Indusource's rights only to products "in the current Safety literature" in July 2012, before the Dormer-Pramet line was in existence.

### E. Defendants' Motion to Dismiss

Defendants move to dismiss the First Amended Complaint on three grounds: (1) the court lacks personal jurisdiction over Sandvik AB; (2) defendants are not signatories of the Wholesale Agreement and therefore, cannot be liable for breach of contract; and (3) defendants are entitled to dismissal of the tortious interference with contractual relations claim as the third-party requirement is missing where the parent company directs its wholly owned subsidiary to breach a contract. Indusource responds that (1) defendants are subject to personal jurisdiction, and are liable for breach of contract under the doctrine of piercing the corporate veil; (2) defendants also may be liable under the theory of attribution or merger; (3) alternatively, defendants qualify as a "third-

parties" and may be liable for tortious interference with contractual relations.

## II. Standard of Law

### A. Rule 12(b)(6).

Federal Rule of Civil Procedure 12(b)(6) allows the Court to make an assessment as to whether the plaintiff has stated a claim upon which relief may be granted. Under the Supreme Court's articulation of the Rule 12(b)(6) standard in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 554-56 (2007), the court must construe the complaint in favor of the plaintiff, accept the allegations of the complaint as true, and determine whether plaintiff's factual allegations present plausible claims. " '[N]aked assertion[s]' devoid of 'further factual enhancement' " are insufficient to " 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557, 570). To survive a Rule 12(b)(6) motion to dismiss, plaintiff's pleading for relief must provide " 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.' " *D'Ambrosio v. Marino*, 747 F.3d 378, 383 (6th Cir. 2014) (quoting *Twombly*, 550 U.S. at 555). Even though the complaint need not contain "detailed" factual allegations, its " 'factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true.' " *New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046, 1051 (6th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555).

### B. Personal Jurisdiction

*3 Defendant Sandvik AB has also moved for dismissal for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). The burden is on the plaintiff to establish that personal jurisdiction exists. *Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002). Because the court is deciding the issue of personal jurisdiction without first holding an evidentiary hearing, the facts are construed in the light most favorable to the plaintiff, the nonmoving party. *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002). The plaintiff "need only make a prima facie showing of jurisdiction." *Id.* (citation omitted). The plaintiff can meet this burden by " 'establishing with reasonable particularity

Indusource, Inc. v. Sandvik Tooling France S.A.S., Not Reported in Fed. Supp. (2016)

2016 WL 6216003

sufficient contacts between [the defendant] and the forum state to support jurisdiction.' " *Id.* (quoting *Provident Nat'l Bank v. California Fed. Savings Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 1987)). Where the facts proffered by the defendant conflict with those offered by the plaintiff, the court disregards the defendant's facts for purposes of ruling on the motion. *Id.* In the face of a properly supported motion for dismissal, however, the plaintiff "may not stand on [its] pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Theunissen v. Matthews*, 935 F.2d 1454, 1459 (6th Cir. 1991).

### III. Analysis

#### A. Piercing the Corporate Veil

Defendant Sandvik AB argues that it must be dismissed because the court lacks personal jurisdiction over it. Sandvik, Inc. does not join in that argument. In addition, defendants argue they are entitled to dismissal of Indusource's breach of contract claim because they are not signatories on the Wholesale Agreement. Indusource responds that the doctrine of piercing the corporate veil defeats both arguments. In connection with its motion to dismiss, defendants have not relied on any affidavits. They rely solely on legal argument and a copy of Sandvik AB's certificate of registration with Bolagsverket, the Swedish Companies Registration Office showing that Sandvik AB is organized and incorporated under Swedish law.

Likewise, Indusource has submitted no affidavits in response to defendants' motion. Attached to Indusource's response brief, however, are five e-mails and two letters to support its alter-ego theory. The emails show that Safety merged with Impero and Pramet in 2012 to form IPS, and also merged with Sandvik Tooling France that same year. (Doc. 20, Ex. A, B). According to the First Amended Complaint and a supporting e-mail, in 2014, "Sandvik" merged IPS with Dormer Tools to create the Dormer-Pramet Group, which would sell products globally under the Dormer-Pramet brand. (Doc. 15 at ¶ 39, Doc. 20, Ex. A). At the same time, according to the First Amended Complaint, Safety advised Indusource to direct any question about U.S. market strategy to Dormer-Pramet's Sales President for NAFTA. (Doc. 15 at ¶ 43). Indusource claims it learned of "Sandvik's" decision to sell its products – including the Safety products covered by the Wholesaler Agreement – exclusively under the Dormer-Pramet brand from various "Sandvik" subsidiaries. Specifically, Indusource

has attached e-mails from various "Sandvik" subsidiaries, including Safety, Pramet, Dormer Tools North America, Sandvik Espanola, S.A. and Sandvik Italia S.p.A., which put it on notice of the plan to switch over to the Dormer-Pramet brand. (Doc. 20, Ex. A, C, D, E). In addition to these e-mails, Indusource relies on two letters which it asserts suggest that defendants failed to maintain corporate formalities. (*Id.* at Ex. F, G). First, Indusource relies on the termination letter, which while written on Safety letterhead, is signed by the sales director of Dormer-Pramet. (*Id.* at Ex. F.) Also, the withdrawal of the premature termination came not from Sandvik Tooling, but from Sandvik, Inc. (*Id.* at Ex. G). Having summarized the proofs submitted in connection with defendants' motion to dismiss, the court turns now to the standard of law to pierce the corporate veil.

**\*4** "Michigan law presumes that, absent some abuse of corporate form, parent and subsidiary corporations are separate and distinct entities." *Seasword v. Hilti, Inc.*, 449 Mich. 542, 547 (1995). The Michigan Supreme Court explained that the presumption that parent and subsidiary corporations are distinct entities, also called the "corporate veil," "may be pierced only where an otherwise separate corporate existence has been used to 'subvert justice or cause a result that [is] contrary to some other clearly overriding public policy.' " *Id.* (quoting *Wells v. Firestone*, 421 Mich. 641, 650 (1984)). The Michigan Supreme Court has held that "[i]n determining whether the corporate entity should be disregarded and the parent company held liable on the contracts of its subsidiary because the latter served as a mere instrumentality or adjunct of the former, each case is sui generies and must be decided in accordance with its own underlying facts." *Herman v. Mobile Homes Corp.*, 317 Mich. 233, 243 (1947). The Sixth Circuit has adopted the alter-ego theory of jurisdiction, which "provides that a non-resident parent corporation is amenable to suit in the forum state if the parent company exerts so much control over the subsidiary that the two do not exist as separate entities but are one and the same for purposes of jurisdiction." *Carrier Corp. v. Outokumpu Ojy*, 673 F.3d 430, 450-51 (6th Cir. 2012) (internal quotation marks and citations omitted).

Michigan courts will not pierce the corporate veil unless, "(1) the corporate entity was a mere instrumentality of another entity or individual; (2) the corporate entity was used to commit a fraud or wrong; and (3) the plaintiff suffered an unjust loss." *Servo Kinetics, Inc. v. Tokyo Precision Instr.*

Indusource, Inc. v. Sandvik Tooling France S.A.S., Not Reported in Fed. Supp. (2016)
2016 WL 6216003

*Co.*, 475 F.3d 783, 798 (6th Cir. 2007) (citing *Foodland Distrib. v. Ali-Naimi*, 220 Mich. App. 453, 457 (1996)). The court focuses its analysis here on the first element – whether the corporate entity was a mere instrumentality of another entity – as the allegations of the First Amended Complaint are sufficient to establish the second two elements. *See Servo Kinetics*, 475 F.3d at 799-800.

Indusource argues this is a text-book example of where the corporate veil should be pierced due to the equities involved. Indusource contends that Sandvik AB completely owns and controls Sandvik, Inc. and Sandvik Tooling, and is using its corporate structure to avoid its obligations to Indusource. Specifically, Indusource claims that Sandvik AB was responsible for the decision to sell the exact same products in the territory Safety had granted exclusively to Indusource through other distributors. In essence, Indusource claims that Sandvik AB swapped a Safety label for a Dormer-Pramet label on products that were the subject of Indusource's exclusive distributorship agreement with Safety in order to avoid the Wholesaler Agreement. Because the products were no longer labeled as Safety products, they were not covered by the Wholesaler Agreement, although in reality Indusource maintains, they were the same products, just under a different name. Accepting these allegations as true, as the court is required to do, there does indeed appear that the policy reasons supporting the doctrine of piercing the corporate veil are implicated here.

In determining whether Sandvik Tooling was the mere instrumentality of its parent corporation, Sandvik AB, this court is guided by the Sixth Circuit's holding that "[w]here the assets of the subsidiary are employed for the benefit of the controlling corporation, in a manner other than as a benefit to the controlling corporation in its capacity as a shareholder, that fact supports finding that the subsidiary was a mere instrumentality of the parent." *Servo Kinetics,* 475 F.3d at 799. Here, Indusource argues that Sandvik AB employed Sandvik Tooling's assets not in its capacity as a shareholder, but in its capacity as the manufacturer of products sold by a different subsidiary using a different brand. (Doc. 20 at 18). [1]

The parties are in agreement that this court considers numerous factors to determine whether the parent can be liable for the acts of its subsidiary, including whether: (1) all capital is provided by the parent; (2) all credit is provided by the parent; (3) the subsidiary purchases exclusively from the parent; (4) the subsidiary is undercapitalized; (5) the parent and subsidiary share officers and directors; (6) officers and directors of the parent provide gratuitous services to the subsidiary; (7) the parent handles payroll for the subsidiary; (8) the parent determines the policies and decisions of the subsidiaries; (9) the entities share a common business address; (10) the subsidiary receives no profit; (11) the parent writes off subsidiary debt; (12) the parent regards the subsidiary's business as its own project. *Herman v. Mobile Homes Corp.*, 317 Mich. 233, 239-41 (1947). Where the parties part ways, is what degree of proof is required at this early juncture.

**\*5** Indusource argues that it has satisfied several of these factors for three reasons. First, Indusource argues that it was Sandvik AB's decision to stop selling products in Michigan under the Safety brand, and that the decision to swap the Safety brand for the Dormer-Pramet brand was really Sandvik AB's "project." Second, Sandvik AB owns 100 percent of Sandvik Tooling and Sandvik, Inc. Third, Indusource argues that Sandvik AB determines the policies and decisions of Sandvik Tooling and Sandvik, Inc. though its global management and control of Sandvik Group business areas. Defendants respond that management alone is insufficient to establish alter-ego jurisdiction. In support of this defense, defendants rely on *In re Automotive Parts Antitrust Litig.*, No. 2:12-cv-00102, 2013 WL 2456610 (E.D. Mich. June 6, 2013).

True enough, the district court in that case noted the mere existence of management overlap was insufficient basis for piercing the corporate veil; but, in that case, the record was fully developed and other factors had been eliminated. Specifically, defendant's vice president submitted an affidavit stating that the subsidiaries maintained separate bank accounts, that the parent did not control the day-to-day business of its subsidiaries, that the parent did not share its financial records with its subsidiaries, that the parent corporation personnel did not hold management responsibilities with its subsidiaries, and that the parent corporation's directors had not held positions on the board of directors of its U.S. subsidiaries. *Id.* at *1-2. Defendants have not submitted a similar affidavit here. Indusource requests limited discovery to explore the details of Sandvik Tooling's capitalization, debt, payroll, officers and directors, internal sales, or cost recovery and requests an evidentiary hearing where it could present additional evidence. While it is unclear that an evidentiary hearing would be warranted, the court finds it would be in the interests of justice to allow for limited

Case 1:23-cv-00201-PLM-RSK   ECF No. 68,   PageID.1479   Filed 09/15/23   Page 36 of 54

Indusource, Inc. v. Sandvik Tooling France S.A.S., Not Reported in Fed. Supp. (2016)

2016 WL 6216003

discovery to allow the plaintiff to investigate the jurisdictional facts. *See* 🔖 *Theunissen v. Matthews*, 935 F.2d 1454, 1465 (6th Cir. 1991).

Defendants maintain that Indusource has not satisfied their burden because they have failed to address many of the factors required to find alter-ego liability. Defendants argue that 🔖 *Singh v. Daimler AG*, 902 F. Supp. 2d 974, 982 (E.D. Mich. 2012), stands for the proposition that dismissal is warranted here as Indusource failed to address "the vast majority of factors" to be considered, a deficit that the court found was fatal in *Singh*. That case is distinguishable, however, because the matter had been pending for over a year at the time the personal jurisdiction issue was decided, competing affidavits had been filed, and defendants had even filed a motion for summary judgment, suggesting that discovery may have already closed, or at least, that significant discovery had taken place. 🔖 *Id.* at 976-77. Under these circumstances, plaintiff could rightly be faulted for failing to address the myriad factors involved in the alter-ego analysis. In addition, the court hinged its opinion on the fact that plaintiff's amended complaint did not even "allege personal jurisdiction via an alter-ego theory or allege any facts that would provide a basis for the exercise of such jurisdiction." 🔖 *Id.* at 982. Given the posture of this case at its infancy, with no scheduling order in place, it strikes this court as premature to fault Indusource for failing to address all of the necessary factors without the benefit of any discovery. This is especially true given the many e-mails and letters which Indusource has submitted in its response which suggest that Sandvik AB may not have fully respected corporate formalities.

**\*6** Defendants' reliance on 🔖 *Midfield Concession Enter., Inc. v. Areas USA, Inc.*, No. 2:14-cv-12174, 2014 WL 4211013 (E.D. Mich. Aug. 26, 2014) also is misplaced. In that case, the court was faced with a motion to remand based on fraudulent joinder. *Id.* at *1. The lawsuit involved a breach of a non-compete agreement for the sale of food and beverage concessions at the airport. *Id.* Plaintiff sued the contract signatory and a third-party, who was not a named party on the contract, on the theory of piercing the corporate veil. *Id.* The third-party defendant was 75 percent owned by the contract signatory, but otherwise, there was no evidence to support plaintiff's claim that the third party was controlled by the contract signatory. *Id.* at * 2-3. The court determined that the third-party had been fraudulently joined because there were no specific allegations that the third-party defendant was

a "mere instrumentality" of the contracting defendant, and even if it were, the circumstances of that case did not support piercing the corporate veil. *Id.* at *3.

In reaching this decision, the court found it significant that the contracting party, who was properly named as a defendant, controlled the acts of its subsidiary, not the other way around. *Id.* at *3. Simply put, the corporate parent was the proper defendant, not its subsidiary. Thus, the court explained that the contracting party could be held liable for acting through the third-party defendant, an issue which was preserved for discovery and further litigation. *Id.* By contrast, here, Indusource alleges that the parent corporation, Sandvik AB, is the controlling party, and owns 100 percent of its subsidiary, Sandvik Tooling. Given this distinction, *Midfield* does not support dismissal here.

For these reasons, the court shall deny defendants' motion to dismiss for lack of personal jurisdiction and shall enter a scheduling order providing for limited discovery pertaining solely to the alter-ego theory of liability.

**B. Attribution or Merger**

Indusource also argues that it may establish personal jurisdiction against the parent corporation based on the conduct of its subsidiary under the theory of "attribution" or "merger." Defendants respond that neither theory is recognized by Michigan law or by decisions of the Sixth Circuit. Having found that Indusource may proceed with its alter-ego theory, the court does not address the issue of whether defendants could also be liable for breach of contract under these alternate theories.

**C. Tortious Interference with Contractual Relations**

Although the First Amended Complaint states a claim for tortious interference with business relations, both parties have discussed the claim as one for tortious interference with contractual relations, which is a separate tort. Because there is no dispute that the Wholesale Agreement was a valid contract entered into by Indusource and Safety, the court agrees that the proper analysis is for tortious interference with contractual relations. In Michigan, the elements of tortious interference with a contract are (1) the existence of a contract, (2) a breach of the contract, and (3) an unjustified instigation of the breach by the defendant. 🔖 *Health Call of Detroit v. Atrium Home & Health Care*, 268 Mich. App. 83, 90 (2005). In addition, the plaintiff must show that the defendant was a "third-party"

Case 1:23-cv-00201-PLM-RSK ECF No. 68, PageID.1480 Filed 09/15/23 Page 37 of 54

Indusource, Inc. v. Sandvik Tooling France S.A.S., Not Reported in Fed. Supp. (2016)

2016 WL 6216003

to the contractual relationship. 🔖 *Servo Kinetics,* 475 F.3d at 800.

According to the First Amended Complaint, defendants are liable for tortious interference for the following reasons:

a. Causing Safety to restrict Indusource's ability to purchase products covered under the Wholesaler Agreement;

b. Causing Safety to discontinue the sale of Safety-branded products;

c. Selling or causing to be sold redundant, identical products and setting up distributorships to sell those products within the Territory designated exclusively to Indusource under the terms of the Wholesaler Agreement without directing or invoicing such business through Indusource; and

**\*7** d. Causing Safety to fail to work in good faith with Indusource to transition the Wholesaler Agreement after the merger of the Safety, Dormer, and Pramet brands.

(First Amended Complaint, ¶ 71, Doc. 15).

Defendant Sandvik AB argues that it cannot be liable for tortious interference with contractual relations because as the parent corporation, it is not deemed to be a separate actor, and cannot be liable in tort. Similarly, defendant Sandvik, Inc., another wholly owned subsidiary of Sandvik AB, argues that the same holds true for affiliated companies. Indusource responds that defendants cannot have it both ways – deny liability under the alter-ego theory on the claim they are separate entities, then claim a unity of interests insulates them from a tortious interference claim. Defendants' argument carries the day and Indusource's remedies are limited to contractual damages against Sandvik Tooling, unless Indusource can pierce the corporate veil and show that defendants should also be liable in contract.

It is enough that Sandvik AB is the parent corporation of its subsidiary Sandvik Tooling to insulate it from liability for a tortious interference with contractual relations claim, unless there is a showing that Sandvik AB acted with an improper purpose, which has not been alleged or argued here. Likewise, Sandvik, Inc. is insulated from tort liability based on its corporate affiliation with Sandvik Tooling. Strong policy reasons support refusing to treat a parent or affiliated company as a third-party for purposes of a tortious interference claim, and limiting a plaintiff to its contractual

remedies. Contract law is based on efficiencies and does not punish the breaching party for terminating a contract that is no longer profitable. The breaching party pays damages owing under contract law – which puts the non-breaching party in the same position had the contract not been terminated. Such a result allows market forces to work and allows the parties to pursue the most economically sound opportunities possible.

Tort law, by contrast, is not based on marketplace efficiencies, but on the breach of duties imposed by law to protect members of society from harm. Tort damages are much broader in scope than contractual damages, and allow for punitive damages. Based on this distinction, a tortious interference with contractual relations claim requires more than a simple breach of contract, but the breach must be "unjustifiably" instigated. 🔖 *Badiee v. Brighton Area Schools,* 265 Mich. App. 343, 366 (2005). Specifically, one "who alleges tortious interference with a contractual or business relationship must allege the intentional doing of a per se wrongful act or the doing of a lawful act with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another." 🔖 *Id.* at 367 (internal quotation marks and citations omitted).

The law is well settled that an agent, acting within the scope of her agency, cannot be liable for causing her principal to breach a contract, unless the agent acted for purely personal gain with no benefit to the corporation. *Willis v. New World Van Lines, Inc.,* 123 F. Supp. 2d 380, 397 (E.D. Mich. 2000). This is true because the agent is not acting for any improper purpose, but solely in the economic interests of the principal. Given this proper motivation, contract damages are deemed sufficient and tort remedies are unwarranted. Similarly, when a parent company acts to protect its economic interests, by encouraging the breach of an unprofitable contract of its subsidiary, the law recognizes that this conduct is not tortious, and damages to the nonbreaching party are limited to contractual damages only. See 🔖 *Servo Kinetics,* 475 F.3d at 801 (98 percent shareholder cannot be considered a third party capable of tortious interference); 🔖 *Camderm Pharmacal, Ltd. v. Elder Pharmaceuticals,* 862 F.2d 597, 601 (6th Cir. 1988) (finding that parent company is privileged to interfere with its subsidiary's contracts in order to further its legitimate business interests); 🔖 *Speroni S.p.A. v. Perceptron, Inc.,* 12 Fed.Appx. 355, 360 (6th Cir. 2001) (collecting cases holding that parent company is privileged to breach a contract that is no longer in its subsidiary's economic interests); 🔖 *Inland*

Case 1:23-cv-00201-PLM-RSK   ECF No. 68,   PageID.1481   Filed 09/15/23   Page 38 of 54

Indusource, Inc. v. Sandvik Tooling France S.A.S., Not Reported in Fed. Supp. (2016)

2016 WL 6216003

*Waters Pollution Control, Inc. v. Jigawon, Inc.*, No. 05-74785, 2008 WL 205209, at *13 (E.D. Mich. Jan. 22, 2008) (holding that affiliated entities with common ownership cannot be liable for tortious interference with contractual relations). The Restatement (Second) of Torts, §§ 767, 769 (1979) also recognizes a financial interest privilege whereby a party may safely interfere with a contract as long as the party acts to protect its own interests.

**\*8** In *Speroni*, the Sixth Circuit recognized that the general rule that a parent company is privileged to breach a contract that is no longer in its subsidiary's economic interests is subject to an exception "when the parent has utilized 'wrongful means' or 'acted with an improper purpose.' " 12 Fed.Appx. at 360. Indusource has not alleged that defendants did so here. Accordingly, the general rule applies, and defendants are entitled to dismissal of the tortious interference of contractual relations claim.

### IV. Conclusion

For the reasons set forth above, defendants' motion for partial dismissal for failure to state a claim and for lack of personal jurisdiction (Doc. 17) is GRANTED in part in that Count II (tortious interference with contractual relations) is DISMISSED, and DENIED in part as to Count I (breach of contract). A scheduling order shall be entered forthwith allowing for Indusource to engage in limited discovery against defendants Sandvik AB and Sandvik, Inc. to explore whether personal jurisdiction can be established based on the doctrine of piercing the corporate veil.

### All Citations

Not Reported in Fed. Supp., 2016 WL 6216003

### Footnotes

1       At oral argument, defendants denied that Sandvik AB is a manufacturer and stated that it acts solely as a holding company.

---

**End of Document**                                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:23-cv-00201-PLM-RSK   ECF No. 68,   PageID.1482   Filed 09/15/23   Page 39 of 54
Patton Wallcoverings, Inc. v. Kseri, Not Reported in F.Supp.3d (2015)
2015 WL 3915916

2015 WL 3915916
Only the Westlaw citation is currently available.
United States District Court,
E.D. Michigan,
Southern Division.

PATTON WALLCOVERINGS,
INC. and James J. Patton, Plaintiffs,
v.
Rami KSERI, Defendant.

No. 15–10407.
|
Signed June 25, 2015.

**Attorneys and Law Firms**

James C. Bieri, Bieri, Bernstein, Detroit, MI, Nicole
Rene Woods, Matthew Lewis Fornshell, Ice Miller, LLP,
Columbus, OH, for Plaintiffs.

Jonathan B. Frank, Maddin Hauser Roth & Heller, P.C.,
Southfield, MI, for Defendant.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS [8]

NANCY G. EDMUNDS, District Judge.

 **\*1** This matter comes before the Court on Defendant Rami
Kseri's motion to dismiss. Plaintiffs Patton Wallcoverings,
Inc. and James J. Patton claim that Defendant committed the
torts of defamation and tortious interference with a business
relationship by sending a "Press Release" to Plaintiffs'
customers and clients. The "Press Release" concerned the
outcome of a previous breach of contract action between these
same parties and before this Court. For the reasons stated
below, Defendant's motion is GRANTED IN PART AND
DENIED IN PART.

### I. Facts

Defendant Kseri is the owner, operator and sole employee
of Elite International Enterprise, Inc. ("Elite"). (Compl.¶ 3.)
James Patton is the president and majority owner of Patton
Wallcoverings, Inc. (Id. ¶ 2.) From March 2010 until August
2011, Elite functioned as sales agent and distributor for Patton
Wallcoverings in the Middle East. (Id. ¶ 8.) In March 2011,
the parties formalized their agreement in a sales distribution

contract. (Def.'s Mot., Ex. C, *Elite International Enterprise,
Inc. v. Patton Wallcoverings, Inc., et al.,* No. 1214620, Dkt.
48 at 3, April 24, 2014.) On August 25, 2011, Patton sent
Kseri an email stating essentially that, contrary to the terms
of the previous agreement, Elite would no long have access
to any of Patton Wallcoverings new product lines. (Id. at 3–
4; Compl. ¶ 10.) In October 2012, Kseri filed suit against
Patton Wallcoverings, alleging that it had breached the parties'
contract by limiting the product that it would make available
to Elite. (Compl.¶ 13.) On April 24, 2014, this Court ruled
that Patton Wallcoverings' conduct constituted a breach of
contract. (Id. ¶ 18; *see also Elite Int'l Enter., Inc. v. Patton
Wallcoverings, Inc., No. 12–14620, 2014 WL 1652197, at
\*5 (E.D.Mich. Apr.24, 2014)* ("The Court finds, therefore,
that there is no genuine dispute as to any material fact on
the claim that Patton breached the contract by limiting Elite's
ability to sell only older product lines."). Following a bench
trial and subsequent motion practice regarding the damages
calculation, this Court awarded Elite $222,465.01 for lost
profits as a result of Patton Wallcoverings' breach. (Id. ¶¶ 19–
21.)

On September 17, 2014, Defendant sent an email to several of
Plaintiffs' competitors, agents, suppliers, and customers. (Id.
¶ 25.) The email included an attachment styled as a "Press
Release." (Id. ¶ 26.) It read as follows (typos, grammatical
errors, and emphasis as in original):

*Press Release*

**For Immediate Release**

**September 15th, 2014**

**Elite International Enterprise, Inc.-Troy Michigan, USA**

Gentlemen,

As known almost to all, Since 2006 Elite International
Enterprises, Inc. had built a solid name as an Exclusive
Agent & Distributor in The Middle East & Africa for several
wallpaper factories.

Norwall Group Inc. / Patton Wallcoverings is one of the
fist companies that we worked with and had extraordinarily
success as a result of devotion, dedication and hard work
promoting the brand in the region at the time when the whole
world was suffering from depression.

2015 WL 3915916

*2 After 7 years of success and in spite of all the obstacles Norwall Group Inc. / Patton Wallcoverings was going through ... Elite International Enterprises, Inc. was still able to perform sales regardless of all these difficulties ... $2.7 Million in sales were made mainly from only 3 collections that had been developed and/or customized by Elite International Enterprises, Inc.

After the business partnership was established with DID Wallcoverings–Korea.

Unfortunately, things had changed! Unprofessional & Irresponsible behaviors were performed by Mr. Patton. Ignorance, Greed & Betrayal are the words we can describe the new joint venture did harvest! Patton Wallcoverings represent by Mr. James Patton decided to cut Elite International Enterprises, Inc out totally forgotten the fact that I have a valid contract for 3 years! After 2 years in courts, the outcome as the following:

After a bench trial in the United States District Court in Detroit, Judge Nancy Edmunds issued a judgment on September 15, 2014 *in favor* of **Elite International Enterprises, Inc.** and against **Patton Wallcoverings** in the amount of **$272,465.01.**

Judge Edmunds earlier decided that **Patton Wallcoverings** *breached* Elite's three-year distribution contract by refusing to sell products to **Elite International Enterprises, Inc.**

(*Id.,* Ex. A.)
Although styled as a "Press Release," Defendant only sent the document to competitors, agents, suppliers, and customers of Patton Wallcoverings. This included Les Serban of Sherman Williams, Patton Wallcoverings' largest customer. After receiving the "Press Release," Serban forwarded the email to Patton Wallcoverings, stating, "This does not paint Jim in a very flattering light...." (*Id.* ¶ 36; Ex. B.) Defendant did not send a copy of the "Press Release" to any of its own clients or customers. (*Id.* ¶ 27.)

Plaintiffs allege that they have "suffered a sharp decline in sales since Defendant's distribution of the "Press Release." (*Id.* ¶ 37.) They allege that Sherwin Williams "immediately ceased promoting [Patton Wallcoverings'] product" after receiving it. (*Id.* ¶ 38.) They further claim that "the owner of Galerie, [Patton Wallcoverings'] largest export customer, ceased all orders from [Patton Wallcoverings] and flew from the United Kingdom to the United States to meet with Mr. Patton regarding the substance of the 'Press

Release." (*Id.* ¶ 40.) This resulted in an 81% drop in sales "for September 2014 as compared to the previous year." (*Id.* ¶ 41.) Finally, they claim that their sales in China and the Middle East dropped 67% for September, October, November, and December 2014 as compared to the previous year. (*Id.* ¶ 39.)

Plaintiffs filed this action on January 30, 2015, alleging claims of defamation, defamation by implication, and tortious interference with a business relationship.

## II. Legal Standard

*3 A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of a complaint. In a light most favorable to the plaintiff, the Court must assume that the plaintiff's factual allegations are true and determine whether the complaint states a valid claim for relief. *See* Albright v. Oliver, 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994); Bower v. Fed. Express Corp., 96 F.3d 200, 203 (6th Cir.1996). To survive a Rule 12(b)(6) motion to dismiss, the complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the allegations in the complaint are true." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal citations and emphasis omitted). *See also* Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio, 502 F.3d 545, 548 (6th Cir.2007). "Only a complaint that states a plausible claim for relief survives a motion to dismiss." Ashcroft v. Iqbal, 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

"Documents attached to the pleadings become part of the pleadings and may be considered on a motion to dismiss." Commercial Money Ctr., Inc. v. Ill. Union Ins. Co., 508 F.3d 327, 335 (6th Cir.2007) (citing Fed.R.Civ.P. 10(c)). "A court may also consider matters of public record in deciding a motion to dismiss without converting the motion to one for summary judgment." *Id.* at 336. In addition, documents not attached to the pleadings may still be considered part of the pleadings when the "document is referred to in the complaint and is central to the plaintiff's claim." Greenberg v. Life Ins. Co. of Va., 177 F.3d 507, 514 (6th Cir.1999) (internal quotation marks and citations omitted).

## III. Analysis

### A. Count One—Defamation

The cause of action for defamation has four elements: (1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault amounting at least to negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by publication. *Smith v. Anonymous Joint Enter.,* 487 Mich. 102, 793 N.W.2d 533, 540 (Mich.2010). "A communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Rouch v. Enquirer & News of Battle Creek Michigan,* 440 Mich. 238, 487 N.W.2d 205, 211 (Mich.1992) (quoting Restatement (Second) of Torts § 559)). [1] "Whether a statement is actually capable of defamatory meaning is a preliminary question of law for the court to decide." *Ghanam v. Does,* 303 Mich.App. 522, 845 N.W.2d 128, 143 (Mich.Ct.App.2014).

Defendant argues that Plaintiffs cannot maintain a claim of defamation because the statements in "Press Release" are either protected as opinion or are substantially true. The Court agrees. Although there is no broad "opinion exception" to defamation, certain statements of opinion are not actionable. *Kevorkian v. Am. Med. Ass'n,* 237 Mich.App. 1, 602 N.W.2d 233, 236 (Mich.Ct.App.1999). "A libel may consist of a statement of fact or a statement in the form of an opinion, but a statement of opinion is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." *Fisher v. Detroit Free Press, Inc.,* 158 Mich.App. 409, 404 N.W.2d 765, 767 (Mich.Ct.App.1987); *see also Falls v. Sporting News Publishing Co.,* 834 F.2d 611, 616 (6th Cir.1987) ("It is the function of the court to determine whether an expression of opinion is capable of bearing a defamatory meaning because it may reasonably be understood to imply the assertion of undisclosed facts that justify the expressed opinion ..."). Opinions based on disclosed facts are known as "pure opinion." Restatement (Second) of Torts § 566 cmt. b (1977). Additionally, statements that are "not provable as false" and statements that "cannot reasonably be interpreted as stating actual facts about the plaintiff" are also not actionable. *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). This includes statements of hyperbole or rhetorical exaggeration. *Ogle v. Hocker,* 279 F. App'x 391, 397 (6th Cir.2008) (stating that "statements of pure opinion, hyperbole, or rhetorical exaggeration" are protected).

*4 Furthermore, "truth is an absolute defense to defamation." *Porter v. Royal Oak,* 214 Mich.App. 478, 542 N.W.2d 905, 909 (Mich.Ct.App.1995). "There can be no recovery in defamation for a statement of fact that is true, although the statement is made for no good purpose and is inspired by ill will toward the person about whom it is published and is made solely for the purpose of harming him." Restatement (Second) of Torts § 581A cmt. a (1977). This includes substantial truth:

> The common law has never required defendants to prove that a publication is literally and absolutely accurate in every minute detail. For example, the Restatement of Torts provides that "[s]light inaccuraices of expression are immaterial provided the defamatory charge is true in substance." [Restatement (Second) of Torts § 581A cmt. f (1977) ]. Michigan courts have traditionally followed this approach.

*Rouch,* 487 N.W.2d at 214. "Minor inaccuracies do not amount to falsity so long as the substance, the gist of the article be justified.... Put another way, the statement is not considered false unless it would have a different effect on the reader from that which the pleaded truth would have produced." *Id.* (quoting *Masson v. New Yorker Magazine, Inc.,* 501 U.S. 496, 517, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991)). *See also Hawkins v. Mercy Health Servs., Inc.,* 230 Mich.App. 315, 583 N.W.2d 725, 734 (Mich.Ct.App.1998) ( "Therefore, if the gist of an article or the sting of the charge is substantially true, the defendant cannot be liable."). This rule applies regardless of which party bears the burden of proving falsity. *Rouch,* 487 N.W.2d at 214.

Plaintiffs identify the final three paragraphs of the "Press Release" as defamatory:

> Unfortunately, things had changed! Unprofessional & Irresponsible behaviors were performed by Mr. Patton. Ignorance, Greed & Betrayal are the words we can describe the new joint venture did harvest! Patton Wallcoverings represent by Mr. James Patton decided to cut Elite International Enterprises, Inc out totally forgotten the fact that I have a valid contract for 3 years! After 2 years in courts, the outcome as the following:
>
> After a bench trial in the United States District Court in Detroit, Judge Nancy Edmunds issued a judgment

2015 WL 3915916

on September 15, 2014 *in favor* of **Elite International Enterprises, Inc.** and against **Patton Wallcoverings** in the amount of **$272,465.01.**

Judge Edmunds earlier decided that **Patton Wallcoverings** *breached* Elite's three-year distribution contract by refusing to sell products to **Elite International Enterprises, Inc.**

(Compl., Ex. A.) Plaintiffs claim that these paragraphs are defamatory for four reasons: (1) because the first paragraph uses the words "unprofessional," "irresponsible," ignorance," "greed," and "betrayal" to describe Plaintiffs; (2) because they raise the false implication that Elite was successful in all of its claims against Patton Wallcoverings as opposed to just one; (3) because they state that Plaintiffs "cut out" and "refused to sell product" to Defendant even though Plaintiffs continued to sell product to Elite until September 2012; and (4) because the final judgment awarded to Elite was $222,465.01, not $272,465.01. (*Id.* ¶¶ 30–34.)

**\*5** None of these reasons provide a valid claim for defamation. Starting with the first, the statement, "Unprofessional & Irresponsible behaviors were performed by Mr. Patton. Ignorance, Greed & Betrayal are the words we can describe the new joint venture did harvest!" is not actionable because it is protected opinion. In determining "whether a statement is protected hyperbole or is capable of carrying a defamatory meaning" the Court considers four factors: "(1) the common usage or meaning of the allegedly defamatory words themselves, whether they are commonly understood to be loose, figurative, or hyperbolic words; (2) the degree to which the statements are verifiable, whether the statement is objectively capable of proof or disproof; (3) the immediate context in which the statement occurs; and (4) the broader social context into which the statement fits."

*Jolliff v. N.L.R.B.,* 513 F.3d 600, 611–12 (6th Cir.2008). Here, the words used in the above statement are "commonly understood to be loose, figurative, or hyperbolic" and are also not "objectively capable of proof or disproof." *Id.* at 611; *see also Ireland v. Edwards,* 230 Mich.App. 607, 584 N.W.2d 632, 637 (Mich.Ct.App.1998) (holding that the statement that "someone is not a fit mother" is not actionable because it is necessarily subjective.). This is highlighted by the use of exclamation points, underlining, and bolding throughout these paragraphs. Furthermore, to the extent that these statements could be interpreted as stating actual facts about Plaintiffs, these facts are disclosed. *See Fischer,* 404 N.W.2d at 767. The "Press Release" accurately states that this

Court found that Patton Wallcoverings breached its contract with Elite and awarded Elite a money judgment. It is also clear from reading the "Press Release" that this is what Defendant's opinion is based on. These statements are accordingly also protected as "pure opinion." *Restatement (Second) of Torts § 566* cmt. b (1977).

The other three reasons all fail because the statements Plaintiffs point to as defamatory are substantially true. Although these paragraphs may contain some minor inaccuracies, their sting or gist is true: the Court did find that Patton Wallcoverings breached its contract with Elite by refusing to sell it certain products and awarded Elite a money judgment as a result. Plaintiffs do not contest this. Instead, Plaintiffs resort to arguing that the money judgment award was $222,465.01 and not $272,465.01 [2] or that they did not totally "cut out" or "refuse to sell product" to Defendant. (Compl.¶¶ 32–33.) These minor differences do not make the "Press Release" actionable. This is the case even if Plaintiffs are correct that Defendant bears the burden of proving truth in this case. *See J & J Const. Co. v. Bricklayers & Allied Craftsmen, Local 1,* 468 Mich. 722, 664 N.W.2d 728, 734 (Mich.2003) ("Where the alleged defamation concerns both a private figure and a matter of private concern, the burden of proving that the statement was not false rests with the defendant."). "[T]here is no reason not to grant a motion to dismiss where the undisputed facts conclusively establish an affirmative defense as a matter of law." *Estate of Barney v. PNC Bank, Nat. Ass'n,* 714 F.3d 920, 926 (6th Cir.2013). The undisputed facts in this case show that the statements in the "Press Release" are substantially true. Therefore, dismissal of Count One is appropriate.

**B. Count Two—Defamation by Implication**
**\*6** Plaintiffs also argue that even if statements in the "Press Release" are true, they are defamatory by implication. The Court disagrees. "A cause of action for defamation by implication exists in Michigan, but only if the plaintiff proves that the defamatory *implications* are materially false."

*Hawkins,* 583 N.W.2d at 732. In *Hawkins,* a hospital issued a press release that inaccurately implied that a nurse was discharged for administering a drug overdose. The press release omitted the "actual justification for her discharge" and created the materially untrue and "clear implication" that the hospital had discharged the plaintiff for her involvement in the administration of the overdose. *Id.*

2015 WL 3915916

Here, the "Press Release" does not contain any materially false implications or omissions. And Plaintiffs' present no alternative interpretation of the statements other than a nebulous reference to "conduct much greater than a simple breach of contract." (Comp.¶ 30.) Plaintiffs argue that the "Press Release" implies that Elite was successful on all of its claims in the prior litigation between the parties, when it was actually only successful on one. *Id.* But the "Press Release" does not create this implication. And even if it did, it would not be materially false. In the prior litigation, Elite's complaint alleged only a single claim for breach of contract, and the Court found that Patton Wallcoverings did commit a breach. If the "Press Release" laid out the Court's rulings in their entirety, the reader would draw that very same conclusion. Plaintiffs' claim for defamation by implication fails.

### C. Count Three—Tortious Interference with a Business Relationship

Plaintiffs' final claim is for tortious interference with a business relationship. Unlike the claims for defamation, Defendant fails to persuade the Court that this claim should be dismissed. Under Michigan law, the elements of tortious interference with a business relationship are: (1) the existence of a valid business relation (not necessarily evidenced by an enforceable contract) or expectancy; (2) knowledge of the relationship or expectancy on the part of the defendant interferer; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resulting damage to the party whose relationship or expectancy has been disrupted. *Lakeshore Cmty. Hosp., Inc. v. Perry,* 212 Mich.App. 396, 538 N.W.2d 24, 27 (Mich.Ct.App.1995).

The parties dispute whether Plaintiffs can establish the third element–intentional interference. To establish this element, Plaintiffs must allege not only that the interference was intentional, but also that it was "improper." *Formall, Inc. v. Cmty. Nat. Bank of Pontiac,* 166 Mich.App. 772, 421 N.W.2d 289, 293 (Mich.Ct.App.1988); *Wetting v. McFeeters,* 104 Mich.App. 188, 304 N.W.2d 525, 529 (Mich.Ct.App.1981). "Improper means illegal, unethical, or fraudulent." *Formall,* 421 N.W.2d at 293. This has also been described as requiring a plaintiff to show that the defendant committed a "a *per se* wrongful act;" or (2) "a lawful act done with malice and unjustified in law for the purpose of invading the contractual rights or business relationship of another." *Feldman v. Green,* 138

Mich.App. 360, 360 N.W.2d 881, 891 (Mich.Ct.App.1984). If a defendant's act was not *per se* wrongful (*i.e.*, "an act that is inherently wrongful or one that is never justified under any circumstances." *Greenwald v. Greenwald,* 480 Mich. 1158, 746 N.W.2d 620, 620 (Mich.2008)), the plaintiff "must demonstrate, with specificity, affirmative acts by the defendant that corroborate the improper motive of the interference." *BPS Clinical Labs. v. Blue Cross & Blue Shield of Michigan,* 217 Mich.App. 687, 552 N.W.2d 919, 925 (1996).

**\*7** The determination of whether an interference is improper requires the consideration of several factors, including: "(1) the nature of the defendant's conduct, (2) the nature of the plaintiff's contractual interest, (3) the social utility of the plaintiff's and the defendant's respective interests, and (4) the proximity of the defendant's conduct to the interference." *Jim–Bob, Inc. v. Mehling,* 178 Mich.App. 71, 443 N.W.2d 451, 463 (Mich.Ct.App.1989). "Where the defendant's actions were motivated by legitimate business reasons, its actions would not constitute improper motive or interference." *BPS Clinical Labs. v. Blue Cross and Blue Shield of Mich.,* 217 Mich.App. 687, 552 N.W.2d 919, 925 (Mich.Ct.App.1996). However, "[a] defendant may not, with impunity, sabotage the contractual agreements of others, and that defendant's cry that its actions were motivated by purely business interests cannot, standing alone, operate as a miracle cure making all that was wrong, right." *Jim–Bob* at 462–63.

Plaintiffs' complaint adequately states a claim for tortious interference with a business relationship. Although the "Press Release" was not defamatory, Plaintiffs may be able to prove that it was improper. Plaintiffs have alleged that Defendant specifically targeted the "Press Release" to only Plaintiffs' "current agents, suppliers and customers." (Compl.¶ 57). Plaintiffs additionally point to communications from customers alarmed by the "Press Release" and allege that they suffered a significant decrease in sales with those customers that received the "Press Release." (*Id.* ¶¶ 36–42). At this stage, Plaintiffs' have adequately plead that Defendant committed a lawful act with the wrongful motive of harming Plaintiffs' existing business relationships. *See Amway v. Procter and Gamble,* No. 98–726, 1999 WL 33494857, at \*4 (W.D. Mich. June 29, 1999). Defendant argues that the "Press Release" was not improper because it was motivated by the desire to revive Elite's "tarnished" reputation. (Def.'s Mot. at 3.) "However, the fact that certain actions are taken with the intent that they inure to

2015 WL 3915916

the personal or pecuniary benefit of the defendant cannot ... weave a broad and impenetrable blanket of immunity from liability for those actions." 🚩 *Jim–Bob,* 443 N.W.2d at 462. Plaintiffs' claim for tortious interference withstands a motion under Rule 12(b) (6).

**IV. Conclusion**

For the reasons set forth above, Defendants' motion is GRANTED IN PART AND DENIED IN PART. Counts One and Two of the complaint are DISMISSED.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 3915916

---

**Footnotes**

1    Plaintiffs do not distinguish between the statements in the "Press Release" they believe defame Patton Wallcoverings, the corporation, and those they believe defame James Patton, the individual. Rather, they claim the statements in the "Press Release" defame both equally. "A corporation does not have a reputation in a personal sense; however, it does have a business reputation that can be defamed." 🚩 *Michigan Microtech, Inc. v. Federated Publications, Inc.,* 187 Mich.App. 178, 466 N.W.2d 717, 720 (Mich.Ct.App.1991). "One who publishes defamatory matter concerning a corporation is subject to liability to it if the corporation is one for profit, and the matter tends to prejudice it in the conduct of its business or to deter others from dealing with it ..."

*Id.* (quoting Restatement (Second) of Torts § 561 (1977)). *See also* 🚩 *Heritage Optical Ctr., Inc. v. Levine,* 137 Mich.App. 793, 359 N.W.2d 210, 213 (Mich.Ct.App.1984) ("Language which casts an aspersion upon [a corporation's] honesty, credit, efficiency or other business character may be actionable."). The Court does not believe that any of the statements in the "Press Release" defame Patton Wallcoverings as a corporation. Nevertheless, the Court's analysis in determining that the "Press Release" is not defamatory to James Patton applies equally to Patton Wallcoverings.

2    At the time of the "Press Release," the statement that the Court awarded Defendant $272,465.01 was true. Although the Court originally awarded Defendant only $222,465.01, (*see Elite International Enterprise, Inc. v. Patton Wallcoverings, Inc., et al.,* No. 12–14620, Dkt. 78, Sept. 2, 2014), it later amended the judgment on September 15, 2014 to $272,465.01. (*Id.,* Dkt.81.) This was two days before the "Press Release" was issued. However, following a motion for reconsideration filed after the "Press Release" was already sent, the Court returned to its original damages award of $222,465.01. (*Id.,* Dkt.87.) Defendant never corrected the "Press Release."

---

Case 1:23-cv-00201-PLM-RSK   ECF No. 68,   PageID.1488   Filed 09/15/23   Page 45 of 54
Siddiqui v. General Motors Co., Not Reported in N.W.2d (2012)
2012 WL 335680

2012 WL 335680
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK
COURT RULES BEFORE CITING.

UNPUBLISHED
Court of Appeals of Michigan.

Athar SIDDIQUI, M.D. and Medical
Associates, P.C., Plaintiffs–Appellants,
v.
GENERAL MOTORS
COMPANY, Defendant–Appellee.

Docket No. 302446.
|
Feb. 2, 2012.

Washtenaw Circuit Court; LC No. 10–001072–CZ.

Before: MURPHY, C.J., and FITZGERALD and METER, JJ.

**Opinion**

PER CURIAM.

*1 Plaintiffs Athar Siddiqui, M.D., and his medical practice Medical Associates, P.C., appeal as of right from the trial court's order granting defendant's motion for summary disposition under MCR 2.116(C)(8). We affirm.

On August 30, 2010, defendant sent a "notice letter" to its employees. The letter contained a list of ten physicians and stated:

Under the provisions of the General Motors Life and Disability Benefits Program for Hourly Employees, certification from the physicians listed below will no longer be regarded as proof of disability or accepted as an excused absence by General Motors.

... Dr. Athar Siddiqui–Internal Medicine, Ypsilanti, MI

* * *

Nothing in this letter otherwise changes your ability to be provided services or treatment from the above listed physicians. Even though GM will not accept certification from these physicians for purposes of establishing an excused absence or proof of eligibility for disability

benefits, GM is not suggesting that these physicians provide inadequate care.

Note, this change does not impact your ability to utilize these physicians for purposes of an FMLA leave, Workers' Compensation leave or under the terms and conditions of the GM Health Care Program for Hourly Employees.

Plaintiffs demanded that defendant immediately retract the letter and issue a corrective notice removing Siddiqui from the list of excluded physicians. Defendant did not retract the letter or issue the requested corrective notice, and plaintiffs filed a civil complaint, alleging defamation by implication, business defamation, and tortious interference with a business relationship. Plaintiffs only included selected portions of defendant's notice letter in their pleadings; they did not attach the letter to their complaint. Defendant filed a motion to dismiss on the basis of MCR 2.116(C)(8), before filing an answer to plaintiffs' complaint. Defendant attached a copy of the letter to its motion, arguing that it should have been attached to plaintiffs' complaint and therefore should be considered a part of the pleadings for the purpose of the motion.

The trial court heard arguments regarding defendant's motion to dismiss, and it granted the motion with regard to the counts of defamation by implication and business defamation. The trial court questioned defendant about the policy decisions leading to its issuance of the notice letter, and it ordered the parties to file supplemental briefs concerning the count of tortious interference with a business relationship. It also ordered defendant to provide a copy of its Supplemental Agreement Covering Life and Disability Benefits Program. After considering the parties' briefs and the Supplemental Agreement, the trial court dismissed plaintiffs' claim of tortious interference with a business relationship.

This Court reviews de novo the trial court's determination concerning a motion for summary disposition. Corley v. Detroit Bd of Ed, 470 Mich. 274, 277; 681 NW2d 342 (2004). Summary disposition will be granted under MCR 2.116(C)(8) when a party "has failed to state a claim on which relief can be granted." MCR 2.116(C)(8). Summary disposition is proper under MCR 2.116(C)(8) "only when the claim is so clearly unenforceable as a matter of law that no factual development could possibly justify a right of recovery." MacDonald v. PKT, Inc, 464 Mich. 322, 332; 628 NW2d 33 (2001). All factual allegations supporting the claim and any reasonable inferences that can be drawn from them are accepted as

Siddiqui v. General Motors Co., Not Reported in N.W.2d (2012)

2012 WL 335680

true, *Detroit Int'l Bridge Co v. Commodities Export Co,* 279 Mich.App 662, 670; 760 NW2d 565 (2008), and are construed in the light most favorable to the nonmoving party, *Cummins v. Robinson Twp,* 283 Mich.App 677, 689; 770 NW2d 421 (2009). Only factual allegations are accepted as true; legal conclusions are not. *Davis v. City of Detroit,* 269 Mich.App 376, 379 n 1; 711 NW2d 462 (2006).

## I. DOCUMENTARY EVIDENCE
## OUTSIDE OF THE PLEADINGS

**\*2** Plaintiffs first argue that the trial court improperly considered documentary evidence outside of the pleadings when it considered the notice letter and the Supplemental Agreement. A motion under MCR 2.116(C)(8) may not be supported by documentary evidence. *Patterson v. Kleiman,* 447 Mich. 429, 432; 526 NW2d 879 (1994); MCR 2.116(G)(5). However, if a pleading is based on a written instrument, a copy of the instrument must, in most instances, be attached to the pleadings and will be considered a part of the pleadings. MCR 2.116(F)(1) and (2).

### A. THE NOTICE LETTER

Plaintiffs argue that the trial court improperly considered documentary evidence when it considered the letter and that the letter should not be considered a written instrument under MCR 2.116(F)(1) because that rule is limited to contracts, "negotiable instruments," and "negotiable documents." We disagree.

This Court has not limited the application and analysis of MCR 2.116(F)(1) to written contracts and negotiable instruments, as plaintiffs suggest. See, e.g., *Dalley v. Dykema Gossett PLLC,* 287 Mich.App 296, 301 n 1; 778 NW2d 679 (2010), and *English Gardens Condo, LLC v. Howell Twp,* 273 Mich.App 69, 80–81; 729 NW2d 242 (2006). The court rule in question does not define "written instrument." Black's Law Dictionary (9th ed) defines "instrument" as "1. A written legal document that defines rights, duties, entitlements, or liabilities, such as a contract, will, promissory note, or share certificate.... An instrument seems to embrace contracts, deeds, statutes, wills, Orders in Council, orders, warrants, schemes, letters patent, rules, regulations, bye-laws, whether in writing or in print, or partly

in both; in fact, *any written or printed document that may have to be interpreted by the Courts* " (emphasis added; internal citation and quotation marks omitted).

In light of the above authorities, plaintiffs are incorrect that MCR 2.113(F) does not encompass a document such as the notice letter. We conclude that the trial court did not err when it considered the notice letter in deciding defendant's motion under MCR 2.116(C)(8). Plaintiffs' complaint references the notice letter on nearly every page. Plaintiffs' complaint quotes selectively from the notice letter, even though it does not include the text in its entirety. Plaintiffs and defendant both rely heavily on the language of the letter in their arguments. It would be illogical to prohibit the trial court from considering a written defamatory statement in its proper context, particularly when plaintiff and defendant rely so heavily on the language of the notice letter and plaintiffs' complaint frequently references it.[1] No error requiring reversal occurred.

### B. FACTUAL TESTIMONY AND
### THE SUPPLEMENTAL AGREEMENT

Plaintiffs further argue that the trial court improperly considered unsupported factual testimony and the Supplemental Agreement because it was documentary evidence that could not support the trial court's decision under MCR 2.116(C)(8).

**\*3** Contrary to plaintiffs' claim that "with respect to Counts I and II" the trial court considered "unsupported factual testimony regarding GM's multi-year examination of doctors certifying disabilities," any extra factual discussion by the trial court was limited to the third count of plaintiffs' complaint. The trial court posed questions to defendant's counsel about how doctors were selected for inclusion in the letter, but the trial court asked these questions *after* it had moved on to discussing plaintiffs' third count. To the extent that defendant's counsel answered the trial court's questions, counsel's answers were consistent with the Supplemental Agreement that the trial court *asked* defendant to include with its supplemental brief. There is no indication that the trial court relied on defense counsel's statements or the Supplemental Agreement in granting summary disposition concerning Counts I and II.

Plaintiffs correctly argue, however, that the trial court erred by asking that the Supplemental Agreement be included in

defendant's brief concerning the third court. Unlike the notice letter, the parties did not rely on the Supplemental Agreement in their briefs and arguments to the trial court until after the trial court began asking about it. The trial court ordered that the parties submit supplemental briefs on Count III, and it ordered defendant to include the Supplemental Agreement with its brief. The trial court subsequently relied on the Supplemental Agreement when it granted defendant's motion on the third count. A motion under MCR 2.116(C)(8) may not be supported by documentary evidence. MCR 2.116(G) (5). Unlike the notice letter discussed above, plaintiffs did not rely on the Supplemental Agreement as the basis for any claim, and the Supplemental Agreement was not referenced in plaintiffs' complaint. Therefore, the trial court erred when it asked for the Supplemental Agreement, because it was documentary evidence that was not included in the pleadings and was not required to be attached to the pleadings under MCR 2.113(F)(1).

However, plaintiffs incorrectly state that the trial court's error requires reversal. We can resolve plaintiffs' tortious interference claim on the pleadings alone, as explained in the analysis of the claim below. This Court can affirm the trial court's decision when it reaches the correct result for the wrong reason. *Lane v. Kindercare Learning Ctrs, Inc,* 231 Mich.App 689, 697; 588 NW2d 715 (1998). [2]

## II. DEFAMATION BY IMPLICATION

Plaintiffs argue that they have pleaded sufficient facts to fulfill the elements of defamation by implication. We disagree.

The elements for a claim of defamation are "(1) a false and defamatory statement concerning the plaintiff, (2) an unprivileged publication to a third party, (3) fault amounting at least to negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm (defamation per se) or the existence of special harm caused by the publication (defamation per quod)." *Kevorkian v. American Med Ass'n,* 237 Mich.App 1, 8–9; 602 NW2d 233 (1999). Only the first and second elements are at issue in this case.

**\*4** The first element of defamation is a false and defamatory statement. *Id.* at 8. Plaintiffs and defendant incorrectly treat this as a single analysis. Whether a statement is capable of a defamatory meaning and whether it is materially false are separate inquiries. *Locricchio v. Evening News Ass'n,* 438 Mich. 84, 130; 476 NW2d 112 (1991). Summary disposition is appropriate when a statement is not capable of a defamatory meaning as a matter of law. *Kevorkian,* 237 Mich.App at 9.

This Court has extended defamation by implication to private figure plaintiffs and non-media defendants. *Hawkins v. Mercy Health Services, Inc,* 230 Mich.App 315, 326; 583 NW2d 725 (1998). In *Hawkins,* the defendant hospital issued a press release that stated, in part:

> As of today, interviews from hospital personnel and physicians regarding this incident [the fatal accidental drug overdose of a patient] and a review of the medical records have been referred to the hospital's Medical Staff Credentials Committee in accordance with Medical Staff by-laws.
>
> The Credentials Committee will perform an evaluation of this patient's medical care.
>
> Our administration has also instituted disciplinary action. In accordance to [sic] our employee disciplinary policies and procedures, one employee is no longer with the hospital. Another employee has received an appropriate disciplinary action. [*Id.* at 321]

The plaintiff was the employee who had been discharged. *Id.* at 319. The plaintiff was terminated because she had lied to her superiors when she denied that a conversation had taken place; in this conversation, she had criticized, in the hearing of his family, the care the overdose patient had received. *Id.* at 318–319. The Court concluded that the press release was materially false because "the clear implication ... is that the hospital discharged [the plaintiff] for her involvement in the administration of the overdose." *Id.* at 335.

Generally, a defamatory communication is a communication that so harms the reputation of persons that their estimation in the community is lowered or that others are deterred from associating with them. *Locricchio,* 438 Mich. at 115. This Court applies an objective, reasonable-person standard to determine whether a statement is defamatory. *Ireland v. Edwards,* 230 Mich.App 607, 618–619; 584 NW2d 632 (1998). The Court in *Hawkins* determined that "the clear implication" of the hospital's statement in that case was materially false. *Hawkins,* 230 Mich.App at 335. Therefore, a statement will be a defamatory statement if the

2012 WL 335680

statement has a clearly defamatory implication when based on an objective, reasonable-person standard.

Plaintiffs' complaint contained the following statements about the letter:

8. On August 30, 2010, GM published defamatory and libelous statements concerning Dr. Siddiqui in a form letter ... stating that "certification from Dr. Siddiqui —Internal Medicine—Ypsilanti, MI—will no longer be regarded as proof of disability or accepted as an excused absence by GM."

* * *

**\*5** 10. The Notice imputes fraud, deceit, dishonesty or reprehensible conduct by Dr. Siddiqui in his treatment of patients and/or certification of their disabilities or excused absences.

* * *

13. The Notice threatens the addressees with the statement that "disability claims requested on or after October 1, 2010 will not be payable" if certification is provided by Dr. Siddiqui, which implies that the addressees should discontinue treatment or any further dealings with Dr. Siddiqui and/or Medical Associates.

We do not find that the allegedly defamatory statements in *Hawkins* and the statements in this case are analogous. When the *Hawkins* statement is read in its entirety, there is a clear implication that the plaintiff in that case was fired because of her involvement in a drug overdose. In this case, the letter simply states that defendant will no longer accept proof of disability or excused absences from Siddiqui. We find that the alleged defamatory implications of the statement—that plaintiff Siddiqui is guilty of fraud, deceit, or dishonesty—are much more tenuous than the implication in *Hawkins*.

Furthermore, "allegedly defamatory statements must be analyzed in their proper context." *Smith v. Anonymous Joint Enterprise,* 487 Mich. 102, 129; 793 NW2d 533 (2010). The letter contained other statements, including "[n]othing in this letter otherwise changes your ability to be provided services or treatment from the above listed physicians," and "this change does not impact your ability to utilize these physicians for purposes of an FMLA leave, Workers' Compensation leave or under the terms and conditions of the GM Health Care Program for Hourly Employees." When defendant has

approved of Siddiqui's services and treatments being used for FMLA leave, for Workers' Compensation leave, and in conjunction with defendant's Health Care Program for Hourly Employees, a reasonable person reading the statements in their proper context would not conclude that defendant intended patients to discontinue their services and treatments with Siddiqui because he is guilty of fraud, deceit, and dishonesty. Moreover, the letter states that "[e]ven though GM will not accept certification from these physicians for the purposes of establishing an excused absence or proof of eligibility for disability benefits, GM is not suggesting that these physicians provide inadequate care." We conclude that the letter is not capable of a defamatory meaning when read in its proper context and viewed under a reasonable-person standard.

Because the statements are not defamatory statements as a matter of law, this Court need not consider whether the statements or associated implications are materially false or whether plaintiffs have pleaded an unprivileged communication to a third party.

### III. BUSINESS DEFAMATION

Plaintiffs argue that the trial court improperly granted summary disposition concerning their claim of business defamation, as applied to plaintiff Medical Associates. We disagree.

**\*6** A for-profit business may assert a defamation claim if a defamatory statement "tends to prejudice it in the conduct of its business or to deter others from dealing with it." *Heritage Optical Ctr, Inc v. Levine,* 137 Mich.App 793, 797; 359 NW2d 210 (1984) (internal citation and quotation marks omitted). A plaintiff must still, of course, meet the other requirements of defamation. One of the basic requirements of a defamatory statement is that it must have a specific application to the plaintiff. *McGraw v. Detroit Free Press Co,* 85 Mich. 203, 209–210; 48 NW 500 (1891); see also *Curtis v. Evening News Ass'n,* 135 Mich.App 101, 103; 352 NW2d 355 (1984). Summary disposition is appropriate when a statement is not capable of a defamatory meaning as a matter of law. *Kevorkian,* 237 Mich.App at 9.

The notice letter does not name plaintiff Medical Associates. Because the allegedly defamatory statements contained in the letter do not have a specific application to plaintiff Medical

Siddiqui v. General Motors Co., Not Reported in N.W.2d (2012)

2012 WL 335680

Associates, the trial court did not err in dismissing plaintiffs' business defamation claim under MCR 2.116(C)(8). [3]

## IV. TORTIOUS INTERFERENCE
## WITH A BUSINESS RELATIONSHIP

Plaintiffs argue that the trial court erred in dismissing the claim of tortious interference with a business relationship because the trial court considered matters outside the pleadings in dismissing this count. For the reasons stated above, we agree that the trial court improperly considered certain evidence when it dismissed this claim. However, we conclude that plaintiffs' claim of tortious interference was properly dismissed even when only the pleadings are considered.

The elements of tortious interference with a business relationship are: "(1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) an intentional interference causing a breach or termination of the relationship or expectancy; and (4) resulting damage to the party whose relationship or expectancy has been disrupted." Joba Constr Co v. Burns & Roe, Inc, 121 Mich.App 615, 634; 329 NW2d 760 (1983). Defendant only disputes the third element, and argues that it did not intentionally interfere with plaintiffs' business.

To meet the third element of tortious interference with a business relationship, a plaintiff must establish that the defendant (1) acted intentionally, and (2) acted either improperly or without justification. Dalley, 287 Mich.App at 323. In order to show that the defendant acted improperly or without justification, a plaintiff must allege either (1) an act that is per se wrongful, or (2) an unjustified but lawful act done with malice for the purposes of invading the plaintiff's relationship. Feldman v. Green, 138 Mich.App 360, 369; 360 NW2d 881 (1984). A "per se" wrongful act is one "that is inherently wrongful or an act that could never be justified under any circumstances." Prysak, 193 Mich.App at 12–13. If the plaintiff does not allege a per se wrongful act, the plaintiff must "demonstrate specific, affirmative acts taken by the defendant that corroborate the improper motive of the interference." Cedroni Assocs v. Tomblinson, Harburn Assocs Architects & Planners, Inc, 290 Mich.App 577, 600; 802 NW2d 682 (2010).

*7 Plaintiffs' complaint states, in pertinent part:

8.... GM published ... a form letter to certain GM hourly employees dated August 30, 2010 regarding its policy for new or recurrent disability claims ("Notice"), stating that "certification from Dr. Siddiqui—Internal Medicine —Ypsilanti, MI—will no longer be regarded as proof of disability or accepted as an excused absence by GM."

* * *

13. The Notice threatens the addressees with the statement that "disability claims requested on or after October 1, 2010 will not be payable" if certification is provided by Dr. Siddiqui, which implies that the addressees should discontinue treatment and/or any further dealings with Dr. Siddiqui and/or Medical Associates.

14. The Notice has deterred and will continue to deter patients of Dr. Siddiqui and/or Medical Associates, including, but not limited to, GM hourly employees, from seeking medical treatment from Dr. Siddiqui and/or Medical Associates.

* * *

36. GM knew of the business relationship and/or expectancy between Plaintiffs and its patients that are GM hourly employees and their family members.

37. GM intentionally and improperly interfered with such business relationship and/or expectancy.

38. GM's intentional, improper and illegal conduct caused the termination of Plaintiffs' business relationship and/or expectancy with its patients that are GM hourly employees and their family members.

This Court concludes that defendant's letter to its employees informing them of a change in its policy is not "per se" wrongful, because the letter could be justified under many circumstances and is not in itself illegal, unethical, or fraudulent. In addition, plaintiffs have not alleged affirmative acts *that corroborate an improper motive of interference.* Indeed, even when plaintiffs' defamation claims are incorporated by reference into plaintiffs' claim of tortious interference, nothing corroborates any improper motive on defendant's part with regard to tortious interference. Because plaintiffs' complaint does not contain any allegations that would corroborate an improper motive of interference, plaintiffs have not sufficiently pleaded the third element of

tortious interference. There is no basis for reversing the trial
court's ruling.

Affirmed.

**All Citations**

Not Reported in N.W.2d, 2012 WL 335680

### Footnotes

1    The Michigan Supreme Court has instructed that "allegedly defamatory statements must be analyzed in their
proper context." *Smith v. Anonymous Joint Enterprise,* 487 Mich. 102, 129; 793 NW2d 533 (2010).

2    Further, when the parties and trial court have relied on documentary evidence outside of the pleadings, this
Court will consider the motion as though it had been granted under MCR 2.116(C)(10) and will consider the
documentary evidence as well as the pleadings. *Kefgen v. Davidson,* 241 Mich.App 611, 616; 617 NW2d
351 (2000). If this Court could not resolve plaintiffs' claim of tortious interference on the pleadings alone,
we could review the dismissal of plaintiffs' tortious interference claim as though it were granted under MCR
2.116(C)(10).

3    Moreover, the business-defamation claim would also fail for the same reasons set forth in section II of this
opinion.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

---

Steverson v. Walmart, Not Reported in Fed. Supp. (2019)

2019 WL 3822179

2019 WL 3822179
Only the Westlaw citation is currently available.
United States District Court, M.D.
Tennessee, Nashville Division.

Verna STEVERSON, et al., Plaintiffs,

v.

WALMART, et al., Defendants.

No. 3:19-cv-00140
|
Filed 08/15/2019

**Attorneys and Law Firms**

Verna Steverson, Dickson, TN, pro se.

Davis Steverson, Dickson, TN, pro se.

Elle G. Kern, George Andrew Rowlett, Howell & Fisher,
PLLC, E. Jason Ferrell, Brewer, Krause, Brooks & Chastain,
PLLC, J. Randolph Bibb, Jr., Whitney H. Kimerling, Lewis,
Thomason, King, Krieg & Waldrop, P.C., Daniel P. Berexa,
Mary E. Stoner, Cornelius & Collins, LLP, Nashville, TN,
Joseph T. Rivera, Jr., Gordon Rees Scully Mansukhani, LLP,
New York, NY, for Defendants.

**MEMORANDUM OPINION AND ORDER**

WAVERLY D. CRENSHAW, JR., CHIEF UNITED STATES
DISTRICT JUDGE

*1 Before the Court in this *pro se* product liability
action is a Report and Recommendation (Doc. No. 43)
in which Magistrate Judge Newbern recommends granting
the five motions to dismiss of Defendants Walmart, CMI
Claims Management, Cincinnati Insurance Company, Ozark
Electronics, and Gree Manufacturing Company (Doc. Nos. 6,
9, 14, 17, 24) and denying the motion to dismiss of Defendant
GE Appliances (Doc. No. 20). Haier US Appliance Solutions,
Inc. d/b/a GE Appliances ("GEA") has filed objections to
the Report and Recommendation. (Doc. No. 44.) No other
objections have been filed. The Court has reviewed GEA's
objections *de novo* as required by Federal Rule of Civil
Procedure 72.

The background of this matter is adequately set forth in the
Report and Recommendation. (Id. at 1-2.) Suffice it to say that
Plaintiffs purchased an air conditioning unit from Wal-Mart

and hired professionals to install the unit in their home. The
Complaint broadly alleges that the unit malfunctioned and
flooded their home, causing mold and resulting permanent
damaged to their health. Plaintiffs brought suit against the
Defendants for $16,500,000 in Tennessee Circuit Court, and
the Defendants removed the case to this Court.

The six defendants filed Rule 12(b)(6) motions to dismiss on
varying grounds. (See Doc. Nos. 6, 9, 14, 17, 20, 24.) GEA
contended that the Complaint wholly failed to assert any facts
naming it, and that Plaintiffs had not set forth facts sufficient
to allow the Court to reasonably infer that GEA is liable for
any alleged misconduct. (Doc. No. 21 at 4.) Without any such
allegations, GEA argued that the Complaint failed to establish
any plausible suggestion of wrongdoing attributable to it. (Id.)

Magistrate Judge Newbern correctly determined that
Plaintiffs claims fall under the Tennessee Products Lability
Act ("TPLA"). See Tenn. Code. Ann. § 29-28-102(6).
Under the TPLA, "[a] manufacturer or seller of a product shall
not be liable for any injury to a person or property caused
by the product unless the product is determined to be in a
defective condition or unreasonably dangerous at the time it
left the control of the manufacturer or seller." Tenn. Code
Ann. § 29-28-105(a). The statute defines a "manufacturer" as
"the designer, fabricator, producer, compounder, processor or
assembler of any product or its component parts[.]" Tenn.
Code Ann. § 29-28-102(4). "[T]he TPLA's definition of
'seller' means any individual regularly engaged in exercising
sufficient control over a product in connection with its
sale, lease, or bailment, for livelihood or gain." Fox v.
Amazon.com, Inc., 930 F.3d 415, 425 (6th Cir. 2019). To
survive a motion to dismiss, a plaintiff under the TPLA must
plead facts that allow the Court to draw a reasonable inference
that (1) the defendant is either a manufacturer or a seller under
the TPLA; (2) the product was defective and unreasonably
dangerous; and (3) an injury was proximately caused by the
defective product. Westfield Ins. Co. v. Broan-Nutone, LLC,
No. 1-10-0110, 2011 WL 9048, at *1 (M.D. Tenn. Jan. 3,
2011) (citing Harwell v. Am. Med. Sys., Inc., 803 F. Supp.
1287, 1296 (M.D. Tenn. 1992)).

*2 Applying this law, Magistrate Judge Newbern rejected
GEA's motion to dismiss arguments. As an initial matter, she
concluded that GEA had overlooked the attachment to the
Complaint that identified the malfunctioning air conditioner
as a "GE" product. (Doc. No. 43 at 5.) GEA objects to this
conclusion on the ground that the attachment is not a "written

Case 1:23-cv-00201-PLM-RSK   ECF No. 68,   PageID.1495   Filed 09/15/23   Page 52 of 54

Steverson v. Walmart, Not Reported in Fed. Supp. (2019)

2019 WL 3822179

instrument" that can be relied upon in this context by the Court. GEA is correct.

Courts often reference the familiar maxim that "[d]ocuments attached to the pleadings become part of the pleadings and may be considered on a motion to dismiss." 🚩 Commercial Money Ctr., Inc. v. Illinois Union Ins. Co., 508 F.3d 327, 335 (6th Cir. 2007). However, under the Federal Rules of Civil Procedure and relevant authority, the Court must conduct a closer examination of the proposed "written instrument." As now-retired Judge Campbell succinctly explained in Benzon v. Morgan Stanley Distributors, Inc., Case No. 3:03-0159, 2004 WL 62747 (M.D. Tenn. Jan. 8, 2004):

> The Court may consider...in addition to the pleadings, any document that is explicitly relied upon in the complaint. The Court may consider, for example, documents incorporated by reference in the complaint or matters of judicial notice, without converting the motion to dismiss into a motion for summary judgment. The Federal Rules of Civil Procedure provide that a copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes. Fed. R. Civ. P. 10(c). A "written instrument" within the meaning of Rule 10(c) *is a document evidencing legal rights or duties or giving formal expression to a legal act or agreement, such as a deed, will, bond, lease, insurance policy or security agreement. The documents that satisfy this definition consist largely of documentary evidence, specifically, contracts, notes, and other writings on which a party's action or defense is based.*

Id. at *2 (emphasis added); see also BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "instrument" as "a written legal document that defines rights, duties, entitlements, or liabilities, such as a statute, contract, will, promissory note, or share certificate"). Based upon this understanding of "written instruments," the Sixth Circuit and

district courts in this circuit have rejected using attachments to the pleadings under Rule 10(c) as "evidentiary material" to *add* substantive allegations to a complaint. Copeland v. Aerisyn, LLC, 1:10-cv-78, 2011 WL 2181497, at *1 (E.D. Tenn. June 3, 2011) (collecting cases on definition of "written instrument" and holding attachment of deposition excerpts and notes from third-parties constitute "extraneous or evidentiary material that should not be attached to the pleadings"); 🚩 In re Empyrean Biosciences, Inc. Sec. Litig., 219 F.R.D. 408, 413 (N.D. Ohio 2003) (holding that, when a complaint is otherwise lacking in substantive allegations, an affidavit that contains evidentiary support for the absent allegations is not a "written instrument" for purposes of Rule 10(c)); 🚩 Bowens v. Aftermath Entm't, 254 F.Supp.2d 629, 640 (E.D. Mich. 2003) (explaining that an attachment, unlike a contract, does not define the rights and obligations of the parties, is not a "written instrument" for purposes of Rule 10(c), and more like the sort of evidentiary material that should not be attached to pleadings) (citing 5 Charles A. Wright & Arthur R. Miller, FED. PRAC. & PROC. § 1327 (2d ed. 1990 & supp. 2002)); Day v. DeLong, No. 3:16-cv-00437, 2017 WL 5903761, at *7 (S.D. Ohio Nov. 30, 2017) (exhibits attached to answer consisting of written narrative reports are "not on par with a contract, deed, will, promissory note, or other such 'written instruments' within Rule 10(c)"), report and recommendation adopted, No. 3:16-cv-437, 2018 WL 348057 (S.D. Ohio Jan. 10, 2018).

**\*3** Here, the attachment to the Complaint upon which the Magistrate Judge relied in denying GEA's motion to dismiss consists of an email from Plaintiffs to "aaaceosolutions@gmail.com," in which they state:

> Due to the damage done to our health and home caused by the GE air conditioner unit malfunctioning, therefore completely destroying our home, and perminatly [sic] and continuously [sic] causing irreversible and ongoing damage to our families [sic] health. We hereby file suit against all responsible parties. We have continuously tried to work with these responsible companies, asking them to repair the damage caused by this faulty air conditioner unit. These companies led us to believe that they

Case 1:23-cv-00201-PLM-RSK ECF No. 68, PageID.1496 Filed 09/15/23 Page 53 of 54

Steverson v. Walmart, Not Reported in Fed. Supp. (2019)

2019 WL 3822179

were going to help us in repairing the damages done. The companies responsible have made no effort in the repair of our home. Therefore, the damage being unrepaired for so long caused my family to be deadly ill. This damage if taken care of when we contacted the companies responsible would not have resulted in the permanent bodily injuries to our family and our home. On April 2018 [sic] we received confirmation from our doctors that this toxic mold were [sic] causing severe health problems and we were ordered to leave our homes immediately.

(Doc. No. 1-2 at 8.) This e-mail is not a "written instrument" under Federal Rule of Civil Procedure 10(c), because it does not evidence legal rights or duties or give formal expression to any legal act or agreement, such as a statute, contract, will, lease, promissory note, share certificate, or other formal agreement. Benzon, 2004 WL 62747, at *2. The email is a communication that, at most, contains additional allegations and expands on Plaintiffs' evidentiary narrative. Rule 10(c) does not permit this Court to rely on the email to supplement the allegations of the Complaint. Copeland, 2011 WL 2181497, at *1; In re Empyrean Biosciences, Inc. Sec. Litig., 219 F.R.D. at 413.

The Court therefore concludes that the Magistrate Judge should not have considered the e-mail attachment for purposes of deciding GEA's motion to dismiss. Without the reference in the e-mail to a "GE air conditioner," it is evident that Plaintiffs have not asserted any facts in the Complaint alleging that GEA is the "manufacturer" or "seller" of the air conditioner, as required under the TPLA to maintain a products liability claim. Because Plaintiffs have not set forth facts sufficient to allow the Court to reasonably infer that GEA is liable for any alleged misconduct, the Court must grant GEA's motion to dismiss. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)) (holding that, to survive a Rule 12(b)(6) motion, " 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.' "); Lutz v. Chesapeake Appalachia,

L.L.C., 717 F.3d 459, 464 (6th Cir. 2013) ("If the plaintiffs do not nudge their claims across the line from conceivable to plausible, their complaint must be dismissed.") (citation and brackets omitted).

The Court notes that Plaintiffs have not filed timely objections to the Report and Recommendation. However, on August 5, 2019, Plaintiffs filed a one-sentence request for "leave of 30 days to amend the Complaint" and to "further respond" with the assistance of counsel they will engage. (Doc. No. 45.) While the Court acknowledges the general leniency that should be afforded to *pro se* litigants, the Court and the parties are always bound by the Federal Rules of Civil Procedure and Local Rules of Court. Plaintiffs' latest filing is clearly insufficient to suffice as objections to the Report and Recommendation. See Cowherd v. Million, 380 F.3d 909, 912 (6th Cir. 2004) ("Generally, the failure to file specific objections to a magistrate's report constitutes a waiver of those objections."). As a request for an extension of time to file a motion to amend, this latest *pro forma* filing lacks substance and is unpersuasive. The motions to dismiss in this case have been pending for nearly six months, during all of which time Plaintiffs have had the opportunity to move to amend their Complaint. During that time, Plaintiffs twice requested additional time to respond to the motions to dismiss, and previously asked for extra time to secure counsel, something that never occurred. Twice, the Magistrate Judge indulged Plaintiffs, but had to resort to threatening them with a recommendation of dismissal. (Doc. No. 35, 37.) Plaintiffs eventually responded to the motions to dismiss months late and never moved to amend. (Doc. No. 38.) Given this history of delay in this matter, their one-sentence request for a further extension gives no sign of being anything other than another in a series of delays. In the end, Plaintiffs have not provided the Court with sufficient basis to postpone decision on the pending Report and Recommendation. That being said, the dismissal of the *pro se* Complaint will be without prejudice, thus ensuring that Plaintiffs "are not irrevocably deprived of [their] day in court." Nwokocha v. Perry, 3 F. App'x 319, 321 (6th Cir. 2001) (citations omitted).

**\*4** Accordingly, the Court rules as follows:

1. The Report and Recommendation (Doc. No. 43) is **APPROVED AND ADOPTED IN PART** regarding the Magistrate Judge's recommendation to grant the motions to dismiss of Defendants Walmart, CMI Claims Management, Cincinnati Insurance Company, Ozark Electronics, and Gree Manufacturing Company and **SET ASIDE IN PART**

**Steverson v. Walmart, Not Reported in Fed. Supp. (2019)**

2019 WL 3822179

regarding the Magistrate Judge's recommendation to deny GEA's motion to dismiss.

2. All Defendants' Motions to Dismiss (Doc. Nos. 6, 9, 14, 17, 20 24) are **GRANTED**.

3. Plaintiffs' Motion for Extension of Time to Amend (Doc. No. 45) is **DENIED**.

4. This case is **DISMISSED WITHOUT PREJUDICE**.

This is a final order under the Federal Rules of Civil Procedure. The Clerk shall close the file.

IT IS SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 3822179

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   4